## Case No. 2,717.

### The CHUSAN.

### [2 Story, 455.]¹

Circuit Court, D. Massachusetts. Oct. Term, 1843.²

LIEN ON FOREIGN VESSEL FOR SUPPLIES AND REPAIRS—WHAT LAW GOVERNS—STATE STATUTE—REGULATION OF COMMERCE—FEDERAL COURTS—WAIVER OF LIEN.

1. The barque Chusan, belonging to Massachusetts, being libelled for materials supplied for repairs done to it in the port of New York, it was *held*, that a lien therefor attached to the barque, as being a foreign vessel; but that the nature, extent, and character of such a lien is to be determined by the general maritime law, and not by the local law of any particular state; and, therefore, that it was not destroyed by the departure of the barque from New York, according to the statute of New York of 1829, (volume 2, p. 493).

[Cited in Leland v. Medora, Case No. 8,237; The Globe, Id. 5,483; Page v. Hubbard, Id. 10,663; The Canada, 7 Fed. 121; The Allianca, 56 Fed. 612.]

2. In a lien for supplies or repairs to a domestic vessel, the admiralty jurisdiction depends upon the local law of the particular state where they are made; but questions of lien upon a foreign vessel are governed by the general maritime law, and not by the local law of any state.

[Cited in The Eclipse, Case No. 4.268; U. S. v. New Bedford Bridge, Id. 15,867; The Alida, Id. 199; Crapo v. Allen, Id. 3,360; The Ann C. Pratt, Id. 409; Ashbrook v. The Golden Gate, Id. 574; Hill v. The Golden Gate, Id. 6,492; The N. W. Thomas, Id. 10,386; Pendergast v. The Kalorama, 10 Wall. (77 U. S.) 212; The Comet, Case No. 3,050; The Albany, Id. 131; The E. A. Barnard, 2 Fed. 722; The Lyndhurst, 48 Fed. 841.]

3. The statute of New York (2 Rev. St. 1829, pt. 3, c. 8, tit. 8, § 1, p. 493), giving a lien to material men for repairs and supplies, &c., is to be considered as remedial in its nature, and not as restrictive; and is perfectly constitutional, as applied to cases of domestic vessels, but not as applied to foreign vessels.

[Cited in Ashbrook v. The Golden Gate, Case No. 574; Hazlehurst v. The Lulu, 10 Wall. (77 U. S.) 203; The Acme, Case No. 28.]

4. The courts of the United States, in the exercise of their admiralty and maritime juris-diction, are exclusively governed by the legislation of congress, or, in the absence thereof, by the general maritime law; and no state can, by its local legislation, narrow or enlarge such jurisdiction.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; The Passenger Cases, 7 How. (48 U. S.) 555; The New York v. Rae, 18 How. (59 U. S.) 226; Shannon v. Cavazos, 61 U. S. (Lawy. Ed.) 929; McAllister v. The Sam Kirkman, Case No. 8,658; The Kate Tremaine, Id. 7,622; The Selah, Id. 12,-636; Hall v. De Cuir, 95 U. S. 499; Watts v. Camors, 10 Fed. 149; The Graf Klot Trautvetter, 8 Fed. 833; The H. E. Willard, 53 Fed. 600.]

5. The power given by the constitution of the United States to congress, to regulate commerce with foreign nations, and among the several states, includes the power to regulate navigation with foreign nations, among the states, and is an exclusive power in congress, which may be exercised with or without positive regulations.

[Cited in the dissenting opinion in Thomas v. Osborn, 19 How. (60 U. S.) 43.]

6. Congress, by conferring the admiralty and maritime jurisdiction upon the courts of the United States, have, by implication, adopted the maritime law, inasmuch as such law is the law of the admiralty jurisdiction, until modified by congress. The case of The Nestor [Case No. 10,126] affirmed.

7. Where the libellants, being ship-chandlers, furnished materials to the barque Chusan, while in New York, and took therefor the promissory note of one of the owners, and gave a receipt, it was *held*, that the matter was governed by the lex loci, by which a note taken for a debt is only conditional payment, until it is duly paid.

[Cited in The Active, Case No. 34; Brown v. Noyes, Id. 2,023; Leland v. The Medora, Id. 8,237; Macy v. De Wolf, Id. 8.933; Reppert v. Robinson, Id. 11,703; The Young Mechanic, Id. 18,180; Carter v. The Byzantium, Id. 2,473; Logan v. The Aeolian, Id. 8,465; Harris v. The Kensington, Id. 6,122; McAllister v. The Sam Kirkman, Id. 8,658; The Bird of Paradise, 5 Wall. (72 U. S.) 561; The Emily Souder v. Pritchard, 17 Wall. (84 U. S.) 670; The Champion, Case No. 2,583; In re Hurst, Id. 6,925.]

8. By the general maritime law, material men have a threefold remedy for supplies and materials furnished to a foreign ship; 1st. against the vessel; 2d, against the owners; 3d, against the master; and neither remedy is displaced, except upon proof that an exclusive credit was given to one of the parties, or to the vessel.

[Cited in The Paul Boggs, Case No. 10,846; The Mary Bell, Id. 9,199.]

9. The lien of material men upon the vessel must be enforced within a reasonable time after the debt is due, or it will not avail against a bona fide purchaser, without notice.

[Cited in Packard v. The Louisa, Case No. 10,652; Leland v. The Medora, Id. 8,237; The John Walls, Jr., Id. 7,432; The Velocity, Id. 16,911; The Celestine, Id. 2,541; The Dubuque, Id. 4,110; The Lyndhurst, 48 Fed. 840.]

10. Under a bill in equity, proof is not admissible with respect to matters not alleged in the bill or answer; and, therefore, one of the parties, who claimed to be a purchaser for a valuable consideration, without notice, not having so stated in his answer; it was *held*, that evidence with regard to the fact was not admissible.

[Cited in The Eliza Jane, Case No. 4.363; Palmer v. Priest, Id. 10,694; In re Hurst, Id. 6,925; The Helen M. Pierce, Id. 6,332.]

11. In this case, one of the owners gave a note to the libellants, as payment for their

---

¹ [Reported by William W. Story, Esq.]
² [Reversing The Chusan, Case No. 2,716.]

claim, and, subsequently, on settling with the other owner, who was the master of the Chusan, he charged his portion thereof to the master; and it was *held*, that the master was not thereby relieved from liability to the libellants, it being a matter between the owners solely.

[Cited in Hazlehurst v. The Lulu, 10 Wall. (77 U. S.) 200; Thomas v. Osborn, 19 How. (60 U. S.) 28; The Mary Bell, Case No. 9,199; The Napoleon, Id. 10,011; The Sarah J. Weed, Id. 12,350.]

[Appeal from the district court of the United States for the district of Massachusetts.

In admiralty. Libel for materials for repairs of the barque Chusan, belonging to the port of Marblehead, in Massachusetts, done in the port of New York. The material facts, set forth in the libel and answer, sufficiently appear in the following statement of facts, agreed to by the parties: The libellants, who are ship chandlers in New York, in September, 1841, furnished a large amount of copper, as per bill, for the barque Chusan, then lying at the port of New York. The said vessel was then owned, three quarter parts by N. Broughton, and one quarter part by —— Cushing, who was also master; both of whom were inhabitants of Massachusetts. The copper was purchased for the barque on a credit for six months, and was charged in the books of the libellants to the barque Chusan and owners. A negotiable note signed by Broughton alone, was subsequently taken by the libellants, and a receipt given therefor, as follows: "Barque Chusan and owners to J. & G. Ring, Dr. to copper materials, $1214.45.' New York, Sept. 3, 1841. Received from N. Broughton, his note at six months, from Sept. 3d. for the above amount. J. & G. Ring, per J. N. Phillips." The note was negotiated by the libellants, and was not in their possession at maturity. Being not paid by Broughton, they took it up as indorsers, and it was offered to be surrendered at the hearing in the court below. In 1842, an action at common law was commenced by the libellants, in the court of common pleas, on the said note against the said Broughton and sundry persons summoned as trustees, which suit was ordered to be discontinued before this libel was filed, but is still on the docket of that court. At the time of the purchase of the copper, a part of the vessel belonging to Broughton had been transferred to Bates & Thaxter, two of the claimants, as collateral security, and stood in their names, but they were not in possession, and had no interest in the management and navigation of the vessel. Mack, the other claimant, proves that the said Cushing, the then other owner, settled an account with Broughton, in which the latter charged the said bill, Cushing being showed said receipt, and acting on the credit of it. Subsequently, Cushing sold his interest in the said vessel to the said Mack, who claimed to be a bona fide purchaser, without notice. The questions intended to be submitted are: First. Whether, under the circumstances, the taking the note was a waiver of the lien upon the vessel for the supplies created by the general maritime law? Second. Whether any lien existed after the departure of the vessel from the state of New York?

[For proceedings in the district court, see Case No. 2,716, next preceding.]

Mr. Ring, for libellants.

The argument for the libellants was as follows:

1. The libellants furnished the materials in September, 1841, on a credit of six months, to the bark Chusan and owners. This is proved by the entries in the books and the account rendered, all showing the bark and owners to be the thing and persons trusted for this debt; by the maritime law, therefore, they had a lien upon the bark in addition to the personal security of the owners. They had an inchoate right to sell the bark for the payment of the debt, at the time of furnishing the supplies, which right became complete, on the termination of the credit. The General Smith, 4 Wheat. [17 U. S.] 438; Peyroux v. Howard, 7 Pet. [32 U. S.] 341; The Nestor [Case No. 10,126].

2d. The subsequent taking of the note of one of the owners, did not discharge the original debt against the barque and owners, unless it was expressly agreed to be taken as such, of which, in the present case, there is no pretence. 6 Term R. 52; 7 Term R. 66; [Chappedelaine v. Dechenaux] 3 Cranch [7 U. S.] 311; [Sheehy v. Mandeville] 6 Cranch [10 U. S.] 264; [Peyroux v. Howard] 7 Pet. [32 U. S.] 344; 2 Camp. 515. On this point the law of New York, as the lex loci, ought to govern (Story, Confl. Laws, 266–274; 1 Conn. 409; 1 Wash. C. C. 340 [Camfranque v. Burnell, Case No. 2,342]); and the law of New York is well settled, that a note is neither payment nor a waiver, except it be agreed to be taken as such (7 Johns. 311; 1 Cow. 290).

3d. If the note be not a waiver of the libellants' claim against the other owners, it cannot be presumed to be a waiver of their lien upon the ship, which the law has expressly given them for their own protection, in case the personal security of the owners should be insufficient. Peyroux v. Howard, 7 Pet. [32 U. S.] 341; The Nestor [supra]. The taking the note is not inconsistent with the full intention on the part of the libellants to retain their lien, and that is the criterion.

4th. Were the note now outstanding, and not surrendered, the case would be different. The law would not then enforce the lien, because the party might be compelled to pay twice. Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611; The Nestor [supra].

5th. In the case of a lien upon real estate, for the purchase money, it has been expressly held, that the debtor's own note does not extinguish the lien; and the principle, in the present case, is precisely analogous. 15 Ves. 347; 1 Wash. C. C. 191 [Harris v. Burchan, Case No. 6,117].

6th. There is no pretence of any equities by third persons, purchasing without notice, except as to one quarter owned by Mack. It is, therefore, exactly as if Broughton, whose note the libellants took, claimed protection for his ship, because he had not paid his own note, when the law gives the libellants both as security.

7th. As to Mack's one quarter, Cushing is responsible to him. Cushing settled with Broughton in his own wrong. Their receipt on the bill informed him, that he was holden, and he was bound to know, that Broughton's note did not pay the debt. 2 Dow. 37, 38.

8th. The statute of New York is merely a domestic law, operating upon domestic ships. It does not pretend to, and could not, over-rule the jurisdiction of the district court, as it existed before.

F. C. Loring, for claimants, argued:

1st, that the contract and lien in this case, were to be governed by the local law, by which the lien ceased when the vessel left the state. 2 Rev. St. N. Y. p. 493. That this law applied both to foreign and domestic vessels; and that it was competent for a state to pass laws regulating the maritime lien on foreign vessels.

2d. That if the lien was to be governed by the general maritime law, it was determined by the giving and receiving of a negotiable note of one of the part owners. The Nestor [supra]; Ramsay v. Allegre, 12 Wheat. [25 U. S.] 611; The William Money, 2 Hagg. Adm. 136.

STORY, Circuit Justice. This is a libel by material-men for materials supplied for the repairs of the bark Chusan. The bark belongs to the port of Marblehead, in Massachusetts, and the materials were supplied for her repairs, while she lay in the port of New York. So that, in the sense of the maritime law, as recognized in this country, it is a case of supplies for a foreign ship lying within a port in a foreign jurisdiction, the different states of these United States being for this purpose held foreign to each other. By the general maritime law, a lien attaches upon the foreign ship, under such circumstances; and the nature, extent, and character of that lien is to be determined, not by the local law of the particular state, but by the general principles of the maritime law applicable to the case. This I conceive to be clearly established by the case of The General Smith, 4 Wheat. [17 U. S.] 488, and Peyroux v. Howard, 7 Pet. [32 U. S.] 324, 341; and it has been fully recognised in this court in the case of the Nestor [supra].

At the threshold of the present case, we are, however, met by the argument, that, by the statute of New York, respecting the lien of material men, and repairers of ships, it is provided, that the lien shall cease, when the ship, for which the supplies are furnish-

ed, has left the state. The language of the statute (2 Rev. St. 1829, pt. 3, c. 8, tit. 8, § 1, p. 493), is, that whenever a debt amounting to fifty dollars or upwards, shall be contracted by the master, owner, agent, or consignee of any ship or vessel within this state, for either of the following purposes: (1). On account of any work done, or materials or articles furnished in this state for or towards the building, repairing, fitting, furnishing, or equipping such ship or vessel: (2). For such provisions and stores furnished within this state, as may be fit and proper for the use of such vessel, at any time when the same were furnished. (3). On account of the wharfage, and the expenses of keeping such vessel in port, including the expenses incurred in employing vessels to watch her; such debt shall be a lien upon such ship or vessel, her tackle, apparel, and furniture, and shall be preferred to all other liens thereon, except mariners' wages. It is observable, that, in this language, there is no allusion to foreign vessels as contradistinguished from domestic vessels. The object of the provision seems to be to enlarge the maritime law by giving the same remedy in regard to domestic vessels, which already existed in relation to foreign vessels. The fair interpretation is, that it is remedial, and not that it is restrictive. The next section provides for the limitation of the lien to twelve days, when the vessel departs from the port of repairs to any other port of the state, and it is to cease when the vessel leaves the state. This statute is, as I conceive, perfectly constitutional, as applied to cases of repairs of domestic ships, that is, of ships belonging to the ports of that state. And if the present were the case of materials and supplies furnished to a ship belonging to New York, and the lien were sought to be enforced in the admiralty courts of the United States, I should have no doubt that the lien created by the law of that state, and not existing by the general maritime law, must be governed throughout by the law of that state, and that, when the ship left the state, it would cease. But in cases of foreign ships, and the supplies furnished to them, the jurisdiction of the courts of the United States is governed by the constitution and laws of the United States, and is, in no sense governed, controlled, or limited by the local legislation of the respective states. The constitution of the United States has declared that the judicial power of the national government shall extend "to all cases of admiralty and maritime jurisdiction;" and it is not competent for the states, by any local legislation, to enlarge, or limit, or narrow it. In the exercise of this admiralty and maritime jurisdiction, the courts of the United States are exclusively governed by the legislation of congress, and in the absence thereof, by the general principles of the maritime law. The states have no right to prescribe the rules by which the courts of

the United States shall act, nor the jurisprudence which they shall administer. If any other doctrine were established, it would amount to a complete surrender of the jurisdiction of the courts of the United States to the fluctuating policy and legislation of the states. If the latter have a right to prescribe any rule, they have a right to prescribe all rules, to limit, control, or bar suits in the national courts. Such a doctrine has never been supported, nor has it for a moment been supposed to exist, at least, as far as I have any knowledge, either by any state court, or national court, within the whole Union. For myself, I can only say, that, during the whole of my judicial life, I have never, up to the present hour, heard a single doubt breathed upon the subject. The distinction between foreign ships and domestic ships, as to this very matter of lien, was stated with great precision and accuracy by Mr. Justice Thompson in Peyroux v. Howard, 7 Pet. [32 U. S.] 341, where he said: "In the case of The General Smith, 4 Wheat. [17 U. S.] 438, it is decided, that the jurisdiction of the admiralty in such cases, where the repairs are upon a domestic vessel, depends upon the local law of the state. Where the repairs have been made, or necessaries supplied to a foreign ship, or to a ship in the ports of a state to which she does not belong, the general maritime law gives a lien on the ship, as security, and the party may maintain a suit in the admiralty to enforce his right. But as to repairs and necessaries in the port or state, to which the ship belongs, the case is governed altogether by the local law of the state, and no lien is implied, unless it is recognised by that law. But if the local law gives the lien, it may be enforced in the admiralty." Language of a similar import was used in the case of The General Smith, 4 Wheat. [17 U. S.] 443. Now, it is impossible to read this language, and not perceive, that the court never entertained the slightest notion, that the question of lien for repairs and supplies of a foreign ship did depend, or could depend, upon the local law of a state. It was treated throughout as governed solely by the maritime law. The very article of the code of Louisiana (article 2748) on which the case of Peyroux v. Howard, 7 Pet. [32 U. S.] 34, turned, makes no distinction between foreign and domestic ships, as to the lien or privilege for repairs; and yet, as we have just seen, the court considered the distinction as clear between the application of that article to a domestic ship, and its application to a foreign ship, in the matter of the lien.

Suppose a state legislature should declare that there should, in future, be no lien of seamen for their wages, on any ship foreign or domestic, or no lien for salvage on any ship foreign or domestic; and no lien for any bottomry bond on a ship foreign or domestic; will it be pretended, that such a law would be obligatory upon the courts of the United States in the exercise of admiralty and maritime jurisdiction? If it would be, a more forcible and complete device to dry up and extinguish the jurisdiction of the courts of the United States in admiralty cases, could scarcely be imagined. The truth is, that the admiralty and maritime jurisdiction of the courts of the United States, given by the constitution, covers not merely the cognizance of the case, but the jurisprudence and principles, by which it is to be administered. It covers the whole maritime law applicable to the case in judgment, without the slightest dependence upon or connection with the local jurisprudence of the state on the same subject. The subject-matter of admiralty and maritime law is withdrawn from state legislation, and belongs exclusively to the national government and its proper functionaries. Besides, by the constitution of the United States, congress has the power to regulate commerce with foreign nations, and among the several states. The power to regulate commerce includes the power to regulate navigation with foreign nations and among the states; and it is an exclusive power in congress. This I conceive has been firmly established by the supreme court of the United States (see Gibbons v. Ogden, 9 Wheat. [22 U. S.] 193–198); and the doctrine stands, as I conceive, upon grounds which cannot be shaken, without endangering the interests of the whole Union, if not the very existence of the constitution as a frame of government for the professed objects and purposes, which it was intended to accomplish. Now, there cannot be a doubt, that the prescribing of rules for the shipping of seamen, and the navigation of vessels engaged in foreign trade, or trade between the states, is a regulation of commerce. In what respect does the exercise of a power to regulate, control, or extinguish the liens given by the maritime law for material men upon foreign vessels, differ from the power to regulate the shipping of seamen, or the navigation of foreign vessels? Each is a regulation of foreign commerce, or commerce among the states. Each includes the assumption of a power to act upon the subject-matter as one of concurrent jurisdiction, instead of belonging exclusively to congress. It would not, I presume, be doubted, that congress might, by an express act, adopt the whole maritime law upon this subject; and if it had so done, no state could rightfully interfere to control, or limit, or restrict it. It seems to me, since the maritime law constitutes the law of the admiralty and maritime jurisdiction of the United States, until modified by congress, that congress, by conferring this jurisdiction upon its courts, has, by implication, adopted that law as a regulation of commerce essential to its proper exercise. Perhaps it will be suggested, that if congress had passed an act upon this subject, it would be of paramount authority, and suspend or control state legislation upon the same subject; but that until congress shall pass such

an act, the states have full authority to act upon it. This I utterly deny. If the power to regulate foreign and inter-state commerce be, as I conceive it to be, exclusive in congress, all state interference therewith is unconstitutional and void. Congress, having power to regulate the whole subject, regulates it as much by what it leaves without any positive regulations, as by what it expressly provides for. The will of congress is equally expressed in both cases. It cannot be that a state has a right to step in, and, by way of compliment, fill up by its own legislation, what is not actually occupied by that of congress. Such was the doctrine maintained by the supreme court in Houston v. Moore, 5 Wheat. [18 U. S.] 1, 21, 22; Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, 196–222, and Holmes v. Jennison, 14 Pet. [39 U. S.] 540, 569, 574–579.

I have thought it right to say thus much upon the general question of the operation of the statute of the state of New York. I ought to add, that I entertain not the slightest doubt that that statute was never intended to be applied to cases of foreign ships, or the repairs thereof, but was designed to be auxiliary to the maritime law, and to give it an extended application to domestic ships, from motives of public policy and general convenience. New York is the last state in the Union, which, in point of interest, could entertain the purpose of crippling the national authority over the regulation of commerce, or of interfering with the great principles of maritime law, upon liens for repairs and other kindred purposes. From what has been already stated, the first point relied on in the defence,—that the lien, if any was, under the circumstances, created by the repairs, ceased with the departure of the ship from the ports of the state, is overruled by the court, as incapable of being maintained as a bar to the suit.

We are next met by the question, whether, in the first place, any lien was created upon the brig for the repairs; and in the next place, if created, whether it was not waived or extinguished by the note of Broughton. The argument, that no lien was created, because of the credit given for the repairs, is not now relied upon, because it is completely disposed of by the case of The Nestor [supra] in this court; and to the considerations there stated, and the decision there made, my judgment still adheres with unabated confidence. Then, as to the note, it is a contract governed altogether by the law of New York (since it is not a maritime contract), at least, to the extent of disposing of the present objection. By the law of New York, as by the law of England, and, indeed, as far as I know, by the law of all the states of the Union, except Massachusetts and Maine, which are governed by a somewhat modified doctrine, a note taken in payment of a debt is ordinarily but a conditional payment thereof; that is, it is an absolute payment only when duly paid.

See Schermerhorn v. Lorines, 7 Johns. 311, and the cases cited in the reporter's note to the third edition, 1832; Muldon v. Whitlock, 1 Cow. 290. The presumption, prima facie, in New York is, that a note taken for a debt is a conditional payment only; but this presumption may be rebutted by proof, that it was taken as an absolute payment. On the contrary, in Massachusetts and Maine the presumption is, prima facie, that a note taken for a debt is an absolute payment, but this presumption may be rebutted by proof, that it was intended as a conditional payment only.

Now, in the present case, there are no circumstances to repel the ordinary presumption, that the note taken in this case was taken · otherwise than according to the lex loci contractus. The ship was not a domestic, but, in the sense of the law, a foreign ship; the owners were strangers, belonging to another state. The ship was, in New York, subject to a general lien for repairs. Under such circumstances, the natural presumption would be, that exclusive personal credit was not given to the owners of the ship, and a fortiori not to one of the owners. The very credit allowed might be naturally and conveniently allowed upon the ground, that the ship itself was a collateral security for the debt, from the lien of the maritime law adhering to it. Besides, upon the very face of the account, there is evidence that credit was originally given to the ship for the supplies and materials. The language of the account is: "Bark Chusan and owners bought of John and George Ring." So that this repels the notion that any mere personal responsibility of the owners was exclusively relied on or taken. We all know, that, by the general principles of the maritime law, material-men have a three-fold remedy for supplies and materials furnished for a foreign ship. First, the ship itself; secondly, the owners; and thirdly, the master; and neither of these remedies is displaced, except by conclusive proof, that an exclusive credit has been, in fact, given to one or more of the parties so liable, or to the ship itself. I need not quote authorities in support of this doctrine. It was fully recognised by Lord Mansfield in Rich v. Coe, Cowp. 636, and Farmer v. Davies, 1 Term. R. 109; and this is regularly true in all cases where the general maritime law governs, whatever may be the case, where the municipal jurisprudence inculcates a more restricted rule. See Abb. Shipp. (Ed. 1829) pt. 2, c. 3, §§ 2, 3, 10. It is certainly the well established doctrine in America, as the cases already referred to abundantly show. The lien, however, which is given by the maritime law on the ship, although it is, or may be treated as, a permanent or abiding lien upon the ship, until the debt is paid, as between the original owners and the material-men, and their personal representatives, is liable to a very different con-

sideration, when the ship has passed into the hands of a bona fide purchaser, for a valuable consideration, without notice of the lien. In respect to such a purchaser, the lien must be enforced within a reasonable time after the debt is due, and the credit, if any, has expired; otherwise a court of admiralty will protect him, as a court of equity would do, against the claim as stale, and inequitable. What will constitute a reasonable time must depend upon the circumstances of each particular case, and is not a point susceptible of any definite or universal formulary of interpretation.

In the present case, no ground of this sort is set up as matter of defence in the answer; and, therefore, I am bound to presume, that none exists; for certainly it is not admissible, without being set up in the answer; for the cause must be decided secundum allegata et probata. Proof is not enough without a suitable allegation to allow its introduction, as allegation would not be enough without proof. In respect to Messrs. Bates & Co., it is clear, that they do not stand in the predicament of bona fide purchasers for a valuable consideration, without notice. Their title is as mortgagees only under Broughton, taking the property as collateral security for a debt due to them by Broughton; and with the admitted fact, that they never took possession of the ship, or interfered with her management, and that the mortgage was antecedent to the supplies of the libellants to repair the ship. Under such circumstances, they were benefited by the supplies, and must be deemed, by their conduct, to admit the right of Broughton to contract as absolute owner for them and to bind the ship by a lien; and this upon the plain maxim, qui sentit commodum, sentire debet et onus. In respect to Cushing's one quarter part of the ship, he paid his proportion of the amount to Broughton; but he was also master of the ship, and if the receipt on the account was shown him, that receipt would also prove, that the account had not been paid by Broughton, but that the latter had given his note only therefor; and under such circumstances he was bound to know that, by law, the note was no discharge of the debt, unless it was duly paid. If, on the other hand, he never saw the account or the receipt thereon, but he trusted entirely to the affirmation of Broughton, that it was paid; then his confidence in Broughton, although it might have misled him, is not to prejudice the libellants in their claim. In either view, therefore, it is plain, that the taking of the note would not discharge him personally, or his share of the ship from the maritime law. The case falls within the principle acted upon in Stewart v. Hall, 2 Dow, 29, and Wyatt

v. The Marquis of Hertford, 3 East, 147, although the circumstances of those cases were not identical with those of the present. The case of Muldon v. Whitlock, 1 Cow. 290, goes the full length of the doctrine; and perhaps presses it somewhat further. See Story, Ag. §§ 433, 434. In respect to Mack, who is the purchaser under Cushing, of his share of the ship, there is nothing in the answer suggesting when he became the purchaser, or under what circumstances, or whether he had notice of the fact of repairs, and the giving of the note by Broughton, and the settlement between the latter and Cushing. This was certainly material to have been stated; and the defect is not entirely supplied by the statement of facts. It is only there stated, that Mack became a purchaser from Cushing, and "claims to be a bona fide purchaser, without notice." When he purchased does not appear. Now, there is nothing in the answer suggesting (as has already been stated,) that the libel was not filed within a reasonable time after the credit had expired, so as to entitle the libellants to enforce the lien. And under such circumstances, the court must presume, that it was filed within a reasonable time. If Mack purchased before the filing, with knowledge of all the facts, he must stand in the same predicament with Cushing. If he purchased without such knowledge, and yet the libel was filed within a reasonable time, he must take his purchase cum onere, and cannot be exempted from the lien. Of course, if he purchased after the libel was filed, he is affected with all the equities between the libellants and Cushing. But as between Broughton and Mack, the latter would have a clear right to have the whole repairs charged upon Broughton's three quarters of the ship, to the exoneration of Cushing's one quarter; and the only open question is, whether, under the circumstances of the present case, Bates & Co. are not affected with the same equities as Broughton. I incline to think, that they are; but if the parties desire to be heard upon that point, I will leave that part of the case open for argument.

My judgment upon the merits is, that the libellants have a complete subsisting lien upon the ship for the amount of their account; and that it is to be enforced by a decree. The decree of the district court (which is understood to have been given upon the mere footing of the authority of the case of The Nestor [Case No. 10,126]) is therefore reversed, and a decree will be entered, according to the opinion which I have now delivered, for the amount of the libellants' account, with costs.