Mr. Justice CURTIS
delivered the opinion of. the court.
This is .an appeal from a decree of the Circuit Court of the -United States for the district, of Maryland, sitting in admiralty. A libel was filed in the District .Court by the appellee, as as-signee of Loring &. Co.¿ merchants in Valparaiso, asserting a lien on. the-,barque. Laura, of Plymouth, in the State of Massachusetts, for the cost of repairs and supplies furnished to that” vessel at Valparaiso. The District Court .decreed for the lien, the Circuit Court affirmed that decree, and the claimants have brought the cause here by appeal.
- It appears that in January, 1849, Phineas Leach, who had previously'been in command of the-barque, contracted with her, ownera to take her on what is termed-“a lay.” There does not appear to have been any written contract of affreight *26 ment .between .them, nor are-the terms of tReir agreement fully described "by .any witness. . But this mode of employing vessels is so common, and its terms and legal effect so well settled by long-usage, it has been .so often before the court's and the subject of adjudication,- that no embarrassment is felt by us concerning the .terms and conditions on which Leach took the vessel. ■ . '
"We understand from his testimony, as well as from known usage, ascertained and adjudicated on in the courts, that the. master, had the entire possession, command, and navigation of the vessel'; that he was to employ her in such freighting voyages ás he saw fit; that he was to vietual and man the.vessel at ins' own expense; .that the owners were to keep the .vessel in repair; that from the gross earnings were to be deducted all. port .charges, and the residue was.to. be divided into two equal parts," one of which was to belong to the owners, the other to the master; and that this agreément could be terminated by the restoration of thé vessél to the owners by. the master; or by their intervention to displace him, at the end of any voyage, but not while conducting - any one which he had undertaken.
• Having possession- and command of the vessel under such a, contract, Leach, sailed" from New Orleans in January, 1849; and after, making a voyage to Rio de Janeiro, he sailed for .and arrived at Valparaiso-in November, 1849.-.
- It is necessary to state with some' particularity the voyages made after his arrival at-Valparaiso. He sailed thence- iii De-cémber, 1849, with a cargo’ of Chili produce, on a' freight amounting to about, $.7,000, for San Francisco, where he arrived and delivered the cargo. He went thence to Talcuhana in-ballast;- and, haying ah intention to buy a. cargo there on his - own .account, he wrote to Loring'& Co., from San Francisco, to obtain from them accredit,' on which to' raise money to pay for the balance of the. cost of this cargo; after appropriating towards, it .the -frieght money in his hands. Loring & Co. granted him- a credit for $3,000, to be reimbursed by ' Leach’s draft on' himself at Sáh Francisco,, at five per cent, premium.' At ..Talcuhana, Leach drew on Loring & Co. for $7,000, and bought doubloons; but, not bfeing able to procure a cargo, tliere,-or at'Maulé, he sailed to Valparaiso, where he-arrived in July, 1850. He handed, .oyer to Loring & Co. the doubloons and the proceeds'of his freight money, which was in. gold dust; and" they supplied the' vessel and purchased a cargo for Leach's account, charging a guaranty commission of five per cent., on their advances, and also a commission of two and a half per cent, on their purchases. Théy rendered Leach *27 an account, in which, he is charged with the supplies of the barque and the cost of the cárgo, and their commissions, and credited with the moneys received from-him.
Leach carried this cargo to San Francisco; and, haying sold it, made an arrangement with the mercantile house of Flint, Peabody, & Co., established’at'San Francisco, that he would’ go to Valparaiso; and ship cargoes thence to them on their, and his joint account, drawing on them for the cost. This arrangement was not limited to cargoes by the Laura, but was to extend to such other vessels as Leach might take up for the purpose.-
From San Francisco, Leach sailed in the Laura to Talcuhana, where He. saw one of the firm of Loring & Co., who gave him a credit for $10,000 to buy a cargo there. He purchased part of a cargo; but, not being able to complete it, went to Valparaiso, where he arrived in May, 1851. He then informed Loring & Co. of his arrangement with Flint, Peabody; & Co., and they agreed to advance him funds, to enable him to carry the arrangement into effect — to be reimbursed by remittances from San Francisco, with five per cent, commission, and one per cent, a month for interest. He accordingly left the vessel, putting Easton, his mate, in command; and Loring.& Co. purchased the residue of the cargo for the Laura, charging its cost to the joint account of Leach, and Flint, Peabody, & Co., and the Laura sailed in May, 1851, for San Francisco. She returned in ballast to Valparaiso in March, 1852; and at that time the principal bills for repairs and supplies, claimed in' this case, were incurred. In March, 1852, the Laura again sailed, under Easton’s command, for San Francisco, via Peyta, where she touched to complete her cargo, and Easton there drew a bill on Loring & Co. to reimburse advances'made to him in that port — partly to pay for cargo purchased there, and partly to pay for supplies and port charges.
The Laura returned to San Francisco in September, 1852, where she was taken possession of by Captain "Weston, who had béen sent there by the owners to bring her home. The owners gave no consent to the above-described proceedings of Leach in respect to. the úse and employment of the barque. From the time when Leach left the command of the Laura; in May, 1851, he remained in Valparaiso, and by means of funds furnished by Loring & Co., and with their assistance, he purchased and-made six shipments of cargoes by véssels other than the Laura, under his arrangement with Flint, Peabody, & Co., and Loring & Co.. He had a desk in the counting house of Loring & Co., and there transacted his business.
' Setting aside all the special facts of this case, and viewing it *28 only as an ordinary- transaction, by which, tie master of. an . American vessel procured repairs and supplies, and advances .of money to pay for repairs and supplies, in a foreign port,tie first question which arises is, whether. he had power to hypothecate the vessel as a security for their payment, otherwise than by a bottomry bond, which must make the payment dependent on the. arrival of the vessel, and creates no personal liability of the owners.
"We understand it to be definitely settled by the cases, of Stainbank v. Fleming, 6 Eng. L. and Eq., 412, decided by the Court of Common Pleas in 1851, and Stainbank v. Shephard, 20 Eng. L. and Eq., 547, on writ of error'in the Exchequer Chamber, so late as 1853, that by the law of England the master of a ship has not power to create a lien on the vessel as security for the payment for repairs and supplies obtained in a foreign port, save by a bottomry bond; that he can only pledge his own credit and that of his owners, but cannot, by any act of his, give the creditor security on the vessel; while, at the same time, the'personal liability of the owners continues., Neither of those learned courts considered — perhaps there was no occasion for them to consider—(Pope v. Nickerson, 3 Story’s R., 465,) what should be the effect, in an English tribunal, of the law of the place where the repairs.and supplies were obtained, if that .law tacitly created a lien on the vessel. See Story’s Con. of Laws, .§ 322 b, 401-’3. These. decisions rest merely, upon the want- of - authority in the master, according to the law of .England, to create, by his own act, an absolute hy-pothecation of the vessel as security for a loan. But the maritime law of the United States is settled otherwise — in harmony with the ancient and general maritime law of the commercial world. The master of a vessel of the United States, being in' a foreign port, has power,- in a case of necessity, to hypothecate the vessel, and also to bind himself and the owners, personally, for repairs and supplies; and he does so without any express hypothecation, when, in a case- of necessity, he obtains them on the credit of the vessel without a bottomry bond. The ship General Smith, 4 Wheat., 488; Peyroux v. Howard, 7 Peters, 324, 341; The Virgin, 8 Peters, 538; The Nestor, 1 Story, 73; The Chusan, 2 Story, 455; The Phœbe, Ware’s R., 263; Davis v. Child, Daveis’s R., 12, 71; The William and Emeline, 1 Blarch. and How., 66; Davis v. A New Brig, Gilpin’s R., 487; Sarchet v. The Davis, Crabbe’s R., 185.
It is hot material whether the hypothecation is made directly to the furnishers of repairs and supplies, or to one who lenas money on the credit of the, vessel, in a case of necessity, to pay such furnishers. “Through.all time,” says "Valin, “by the *29 use and custom of the seas,- it has been allowable for the master to borrow money, on bottomry or otherwise, upon the hull and keel of the vessel, for repairs, provisions, and other necessaries, to enable him to continue the voyage;” Com. on Art. 19, Ord. of 1681; and this assertion rests upon sufficient authority. The Roman law, de exercitoria actioné, D. 14, 1, authorized a simple loan, .and does not confine the master to borrow on bottomry. The Consulat del Mare, ch. 104, 105, 236, the laws of Wisby, art. 13, the laws of Oleron, art. 1, Le Guidon, ch. v, art. 33, the French ordinance of 1681, art. 19, as well as the present French code de commerce, art. 234, concur in allowing the master to contract a simple loan, in a case of necessity, binding, on the vessel. A' difference of opinion exists between Valin and'Emerigon, concerning the power of the master also to hind the owner to accept bills of exchange for the sum borrowed; but they concur in opinion that the master ,has power to contract a loan to pay for repairs and supplies,' and to give what we term a lien on the ship as security, in a case of necessity. See Valin’s Com., art. 19; Emerigon’s Con. á la Grope, ch. 4, sec. 11; vol. 2, pp. 484, &c. In another place, ch. 12, sec. 4, Emerigon observes, “It matters little whether one has lent money or furnished materials.” The older as well' as the more recent commentators are of the same opinion. Kuricke, 765; Loccenius, lib. 3, ch. 7, n. 6; Stypmannus, 417, n. 107; Boulay Paty Cours de Droit, Com. tit. 1, sec. 2, vol. 1, p. 39, and tit. 4, sec. 14, vol. 1, pp. 151-3; Pardessus Droit Com., vol. 3, n. 631, 644, 660; Pardessus Col., vol. 2, p. 225, note. The subject l^as been elaborately examined by Judge Ware, in Davis v. Child, Daveis’s R., 75, and we are satisfied he arrived at the correct result.
Nor do we think the fact that the master was charterer and owner pro hac vice necessarily deprived him of this power. It is true it does not exist in a place where the owner is present. (The St. Jago de Cuba, 9 Wheat., 409.) But this doctrine cán-not be safely extended to the case of an owner pro hac vice in command of the vessel. Practically this special ownership leaves the enterprise subject to the same necessities as if the master were master merely, and not charterer, and the maritime law gives him the same power to borrow to meet that necessity, as if he were not charterer.. The Consulat de la Mer, ch. 289, (2 Par. Col., 337,) has provided for the very ease, for it makes the interest of the general owner responsible for the contracts of the master who has received the vessel “en ■ commande; ” and one species -of this contract was what we Bhould term “a lay” — that is, a participation in profits. Vide *30 2 Par. Col., 186, note 3; 52, note 1; 49, note. 4; and the chapters there referred to.
• It is true the master cannot bind the general owners personally for supplies which he, as charterer, was to furnish. (Webb v. Pierce, 1 Curtis, 110.) Neither could he bind them beyond. the value of their shares in the vessel, under the ancient maritime law. (Consulat, ch. 34, 239, and Pardessus’s note, vol. 2, p. 225.) Emerigon is of opinion that the effect of the Prendí ordinance is the same.. (Con. á la Gropé, ch. 4,. sec. 11.) ,.In our law, if the master is the agent of the owners, his contracts are obligatory on them personally. "When he acts on his own account, he does not create any obligation on them. But it does not follow that he may-not bind the vessel. In Hickok v. Buckingham, 18 How., it was held that contracts of af-freightment entered into by the master, within the scope of his apparent authority as master, bind the vessel to the merchandise for the performance, of such contracts, wholly irrespective of the ownership of the vessel; and .whether -the master be the agent of the general or special owner — and this ' upon the.principle that the general owner must be presumed to consent, when he lets the vessel, that the master may ma^e such contracts,-which- operate as a tacit hypothecation of the vessel. And;so in this case, we think,.the general owners' must be taken to have consented that, if a base of necessity should arise in .the course of any voyages which the master' was carrying-on for the joint benefit of themselves, and himself, he might obtain, on ihe credit of the vessel, such, supplies- and repairs as should be.needful to enable him.to continue the - joint adventure.. This presumption of. consent by the general owner is entertained by the law from the. actual circumstances - of . the case, and from considerations ■ of the convenience and - necessities of the commercial world.
But the limitation of the authority of the master to cases of necessity, not only of repairs and supplies, but of credit .to obtain them', and the requirement that the lender or furnishes '.should see to it,’that apparently such, a case, of necessity exists, are as ancient an& well established as the authority itself.
Tn some- of, the old sea laws, they are declared in express -terms, .as they were in the Roman - law': Aliquam .diligentiam in ea re creditorem debere prsestare, D. 14, 1, 7; navis in ea causa' füisset ut refici deberet, D; 14, 1, 7. And in the Con-sulat del Mare, ch. 107, “But the Merchant should' assure. himself fhat-whathe lends is destined for the use-of . the ship,. and that it is- necessary for that object.”
A, reference to the other codes cited above will show that a case of necessity was uniformly required; and the .comment» *31 tors all agree, .that if one lend money to a master, knowing he has not need to borrow, he does not act in good faith, and the loan does not ^blige the owner. Valin, art. 19; Emerigon, Con. á la Grope, ch. 4, sec. 8; and the older commentators cited by him. Boulay Paty Conrs de Droit Com., tit. I, sec. 2, tit. IV, sec. 14; and see the authorities cited by him in note 1, p. 153.
To constitute a case of apparent necessity, not only must the repairs and supplies be needful, but it must be apparently necessary for-the. master to have a credit, to procure thém. If the master has funds of his own, which he ought to apply to purchase the-supplies which he is bound by the contract of hiring to furnish himself, and if he has funds of the owners, which he ought to apply to pay for the repairs, then no case of actual necessity to 'have a credit exists. And if the lender knows these facts, or has the means, by the use of due diligence, to ascertain them, then no case of apparent necessity exists to have a credit; and the act of the master in procuring a credit does not bind the interest of the general owners in the' vessel.
We now come to the application of these, principles 'to the case at bar.'
The freight-money earned by the Laura was applicable, and ■ ought to have been applied, by the master, to the necessities of the vessel;. the one-half, (after deducting port charges,) which belonged to himself, should have been applied to'pay the wages of the crew,, and obtain supplies for .the vessel; the other half, which belonged to the owners, to paying for necessary repairs.
The amount of this freight-money actually earned and received was about $12,000. Besideá this, the Laura had made two voyages to San Francisco, with cargoes belonging to Leach and to him, and Flint, Peabody, & Co., before the bills now in question were incurred. We hesitate to declare that a master, who takes a vessel on “a lay,” can use it- to carry cargoes of his own. The practical difference to the owners is, that there can be no agreed rates of freight, and no such security on the . cargo for its‘payment, as the marine law ordinarily provides, and as the owners may be reasonably considered to contemplate when they let the vessel. (Gracie v. Palmer, 8 Wheat., 605.) But this point has not been adjudicated on by the courts, nór does this case furnish any . evidence of what the usage is in this particular. Waiving a decision of this question, it is, at all events,- clear the vessel earns for the owners a reasonablp freight by carrying cargo of the master; and, according to the evidence in this ease, that reasonable freight must have been *32 set down for each of the two voyages on which the cargo of the master was carried, at the sum of $7,000, that being the sum earned on the preceding voyage between the same ports, and there being no evidence before us of a change in the price of freights in the intermediate periods; so that when these expenses, now in question, were incurred, the master had received in money, as freight, $12,000, and must be taken to have received, in the enhanced value of his own merchandise, through its carriage, to San Francisco, $14,000 more. The amount previously' expended by him for repairs and supplies, at Valparaiso, does not appear to have exceeded $3,000. The amount expended at San Francisco does not appear, but there is no reason to suppose.it was considerable.
In July, 1850, Loring & Co. received from Leach his funds, supplied, him with credit, and purchased a cargo for him. In May, 1851, they made themselves parties to an arrangement, under which Leach was to quit the command of the vessel, and become a merchant, resident at Valparaiso. "Whether they did or did not know Leach had the vessel on a lay, this was obviously wrong as respected the owners; for though, under a lay, the master is owner pro hete vice, yet there is a personal confidence reposed in him as master, which he cannot delegate to another, except in case of necessity. Before the credit now in question was given by Loring & Co., they not only had notice that Leach had wrongfully deserted the command of the vessel, and had diverted the freight which the vessel had earned and ought to have earned into his business as a merchant, but they had actually assisted him to do so, by receiving freight-money, and mingling it with other funds in their hands, out of which and their own funds they made advances to enable him to pay for cargoes; and they acted as his agents in their purchase.; and they had, moreover, profited largely by so doing, charging high rates of interest, as well as commissions.
It should be added, that the owners have received nothing for their part of the earnings of their vessel, during all these voyages; for though, since his return to this country, Leach has rendered his accounts to the owners, they refused to settle them, as, rendered, and Leach testifies he has not the means to pay any balance due to them.
In such a state of facts, wé are of opinion Loring & Co. had no right to lend' Leach money, or furnish him with supplies on the credit of the ship, and cannot be taken to have done so.
Our opinion is, that inasmuch as the freight-money earned by the vessel was sufficient to pay for all the needful repairs and supplies, and might have been commanded for that use if they had not been wrongfully diverted, no case of actual *33 necessity to encumber the vessel existed; and as Loring & Co. not only knew this, but aided Leacb to divert the freight-money to other objects, thfey obtained no lien on the vessel for their advances. .
The cause must be remanded, with directions to dismiss the libel with costs.
Mr. Chief Justice TANEY,■ Mr. Justice McLEAN, and Mr.'. Justice WAYNE, dissented, and Mr. Justice McLEAN and Mr. Justice WAYNE concurred with .the Chief Justice in the following dissenting opinion.