## THE JOHN L. LAWRENCE.

### (District Court, E. D. North Carolina. February 16, 1916.)

1. MARITIME LIENS ☞40—SUPPLIES—AGREEMENT OF OWNER—WAIVER.

Four steamers belonging to the same owner were chartered for a common enterprise. The charterer, being without money or credit to buy necessary supplies, by agreement with the owner gave notes to libelants for supplies to be furnished on the credit of the vessels, each of which was named in the notes. The supplies were furnished to the charterer for the joint use of the vessels, to which they were distributed as needed. They were purchased and furnished in a foreign port, and were necessary. A suit having been brought against the steamers by others, libelants intervened, setting up one half their claims against the steamer Portland and the other half against the Lawrence. The vessels were sold, and the proceeds of the Portland were exhausted in the payment of prior claims by seamen; but from the proceeds of the Lawrence there was a surplus after paying all claims except that of a mortgagee. *Held*, that the transaction by which the supplies were obtained created, as was intended, a maritime lien on all the steamers jointly, which was superior to that of the mortgage; that libelants, by filing their libels against the Portland for a portion of their claim, did not waive their lien on the Lawrence, but might, on surrender of the notes, assert the same for the amount remaining due by an amended libel.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. §§ 78-94; Dec. Dig. ☞40.]

2. MARITIME LIENS ☞43—SUPPLIES—WAIVER BY ACCEPTANCE OF NOTES.

The acceptance of notes for supplies furnished to a vessel, unless so intended, does not operate as a payment, nor as a waiver of the right to a lien.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 82; Dec. Dig. ☞43.]

In Admiralty. Suit by the Weller Coal Company against the steamer John L. Lawrence. In the matter of the intervening libels and amended libels of E. V. White & Co., Incorporated, and the Robert P. Voight Company. On exceptions to report of special master. Exceptions sustained, with decree for intervening libelants.

Robert Ruark, of Wilmington, N. C., and Robert P. Ingram, of Norfolk, Va., for libelants.

Herbert McClammy, of Wilmington, N. C., for Astor Trust Co.

CONNOR, District Judge. The original libel herein was filed by the Weller Coal Company, and, upon process issued and decrees rendered in the cause, the steamer John L. Lawrence was sold by the marshal and the proceeds paid into court. A number of intervening

libels were filed, all of which, save those of E. V. White & Co., Incorporated, and the Robert P. Voight Company, have been disposed of by decrees. At 'the time the original libel was filed, other original and intervening libels were filed against the steamers Portland, Nat Strong, and Adroit. The said steamers, together with the John L. Lawrence, were owned by the Atlantic Phosphate & Oil Corporation, of New York, and were chartered by the Atlantic Coast Products Company, for the purpose of engaging, jointly, in fishing for menhaden on the coast of North Carolina. All of the steamers were sold under decrees of the court, and the proceeds, save that portion from the sale of the John L. Lawrence, now in court, were applied to the discharge of the claims established against them. The controversy between the intervening libelants, E. V. White & Co., Incorporated, and the R. P. Voight Company, and the Astor Trust Company of New York, holding a mortgage on the steamers, was referred to Eugene S. Martin, Esq., special master, who, after hearing the evidence, reported the following facts:

"Libelants are mercantile corporations of Norfolk, Va. J. F. Bussells, president of the Carolina Coast Products Company, needing supplies to operate the steamers and carry on the business in which they were engaged, and which he was unable to purchase in Wilmington, N. C., on credit, went to the city of Norfolk, Va., where he had friends, and saw the libelants, E. V. White & Co., Incorporated, and the Robert P. Voight Company, and stated to them that the steamers were in need of supplies, that he had no money or credit, and had come to Norfolk to do business with them. They seemed willing to do business with him, and, while they did not say that they doubted the credit of the Carolina Coast Products Company, they desired to hear from the owner of said steamers in New York before they delivered any supplies, as the said Bussells stated that he had no right to pledge the steamers.

"Thereupon the said Bussells and Mr. Robert P. Ingram (the secretary and treasurer of the Voight Company and attorney for White & Co.), on behalf of the said E. V. White & Co. and Robert P. Voight Company, went to New York and there interviewed Mr. Smitson, president of the Atlantic Phosphate & Oil Company, and Mr. Meadows, a part owner of the Carolina Coast Products Company, and chairman of the financial board and general manager of the Atlantic Phosphate & Oil Company, the owner of said steamers, and Capt. Bussells stated to them that Mr. Ingram was not satisfied with the financial condition of said companies, and it was then agreed between them that the Carolina Coast Products Company should execute notes to E. V. White & Co. and the R. P. Voight Company, respectively, for the supplies to be delivered by them to said steamers, said notes to bear the names of the said steamers, to wit, John L. Lawrence, Portland, Nat Strong, and Adroit, and to be indorsed by Mr. Meadows and Capt. Bussells. The notes, having been drawn in Norfolk and indorsed there by Bussells, were carried to New York and there indorsed by Meadows for the amount of supplies Capt. Bussells estimated the steamers would require. It was further agreed that, as the steamers would need supplies, the Atlantic Phosphate & Oil Company would make the steamers responsible for them, and, for this reason, the names of the steamers were put on said notes, and it was alone on this agreement that supplies were furnished on the credit of the steamers.

"Two notes were executed by the Carolina Coast Products Company, one for $1,800, payable to Robert P. Voight Company, and the other for $500, or $550, payable to E. V. White & Co., signed 'Carolina Coast Products Company, by J. J. Bussells, President,' for supplies furnished steamers John L. Lawrence, Portland, Nat Strong, and Adroit, and indorsed by Meadows and Bussells.

"Upon the execution of the notes, as aforesaid, Mr. Ingram and Capt. Bussells returned to Norfolk, when the notes were delivered by Capt. Bussells

to the Voight Company and White & Co., respectively, and they delivered the supplies, as called for by the Carolina Coast Products Company, at its factory, and said company distributed them to the several steamers. * * *"

The libelants, E. V. White & Co. and Robert P. Voight Company, filed intervening libels against the steamers John L. Lawrence, for $258.17, in favor of White & Co., and $819.33, being one half the amount due for the supplies, in favor of R. P. Voight Company, which amounts have been paid from the proceeds of the sale of said steamer. They filed libels for like amounts, being the other half of the amounts due for supplies furnished said steamers, as hereinbefore stated, against the steamer Portland. Decrees were rendered for the amounts claimed, but the proceeds of the sale of the steamer were exhausted in the payment of claims having priority.

A portion of the supplies furnished the steamers by libelants, were on hand, not having been consumed, at the time the libels were filed, which were turned over to the receiver of the Coast Products Company and sold by him. The supplies were invoiced to the several steamers by name, jointly, to be distributed between them by the officers and agents of the company. Libelants had no knowledge or notice that the supplies were not used as was intended by them. There is due libelants the amounts for which the intervening libel was filed. After the sale of the steamers and the payment of the claims against them, the libelants were, upon their application, permitted to amend their intervening libels against the steamer John L. Lawrence, by claiming from the proceeds of the sale, now in the possession of the court, the balance due them on account of the supplies furnished, as hereinbefore set forth; said amount being more than sufficient to pay said claims. The Astor Trust Company, having intervened for the purpose of asserting claim by virtue of the mortgage held by it upon the steamers, filed answer to the amended intervening libels. The libelants, since the hearing before the special master, have surrendered and filed with the clerk the notes executed as hereinbefore stated.

[1] The special master was of the opinion, and so reported, as a conclusion of law that:

"The agreement entered into by the Atlantic Phosphate & Oil Company, the Carolina Coast Products Company, Meadows, Ingram, and Bussells, and the transactions thereunder relative to the supplies furnished, constituted an unrecorded verbal mortgage of said steamers to secure the notes executed to E. V. White & Co. and the Voight Company, subject to the deed of trust or mortgage executed by the Atlantic Phosphate & Oil Company to the Astor Trust Company, but do not create, upon the facts found, a maritime lien on said steamers."

To this conclusion of law the libelants filed exceptions. It is insisted that, by reason of filing the libel against the Portland for one-half the amount due the intervening libelants, they elected to look to that steamer for that portion of their claim, and thereby waived any lien which they may have had against the John L. Lawrence therefor. The libelants introduced a letter received from the attorney for the bondholders' committee, November 23, 1914, at or about the time the steamers were sold, in which he wrote:

"Confirming our understanding, I beg to state that if you choose to assert the entire claims of Robert P. Voight Company and E. V. White & Co., Incorporated, against the steamer Lawrence, neither the bondholders' committee nor their attorney will make any objection on the ground that you are guilty of laches, or might have proved your claim against the steamer Portland, provided that your claims are in all respects, on the merits, properly provable against said steamer Lawrence."

While the libels and intervening libels by the seamen and other claimants were filed against the steamers, and they were sold separately and their proceeds applied to the claims so asserted, it is evident that they were all owned by the same corporation, chartered by Carolina Coast Products Company for, and engaged in, a common purpose and venture. Capt. Bussells was in control of them. The supplies were furnished upon their joint credit and for their joint use. The goods were invoiced to all of the steamers, treating them as engaged in a common enterprise. The distribution of the supplies among the steamers was left to Capt. Bussells or his employés. There is no question of the amount or price of the supplies; in the original intervening libel, these elements were found by the master, without any controversy on the part of complainants. There is no controversy in regard to the necessity for the supplies to enable the steamers to proceed on their voyage, or the enterprise for which they had been chartered by the Coast Products Company. I can perceive no valid reason why, unless for some other cause, the libelants are deprived of a maritime lien, they may not have filed their libel upon each of the steamers for the entire amount and recovered the whole amount out of either of them. There was no question, as between the libelants and the owners, charterers, or claimant, of separate liability. It turned out that, because the seamen on the separate steamers filed libels for wages against the one upon which they were engaged, the proceeds of the Portland were consumed in the payment of their wages, which were entitled to priority over the claim of the libelants for supplies. It was evidently in recognition of this condition, and this right of libelant, that the attorney, representing the bondholders' committee, the only persons who had any substantial interest in the matter, wrote the letter introduced by the libelants. I do not think that, by filing their libel for a portion of their claim against the Portland, the libelants waived their rights or lien, if any they had, on the steamer Lawrence, and this was the attitude of the attorney representing the bondholders.

We are thus brought to inquire whether, upon the facts found by the special master, the intervening libelants acquired a maritime lien on the steamers for the amounts due for the supplies furnished. The master construed the transaction as an attempt on the part of the owners to give the libelants "a verbal mortgage" on the steamers, which, as he very correctly held, was invalid as against the claimant Astor Trust Company. The steamers were in a foreign port; their home port being New York. The supplies were necessary, and were furnished upon the request of the master—the charterer and the owner. It would seem that, in the absence of a finding that the credit was given to the owners, and not the steamers, a maritime lien attached. The case which appears more nearly analogous to the conditions found

here is The Kalorama, 10 Wall. 204, 19 L. Ed. 941. There the vessel, being navigated between Baltimore and Charleston, by Prendergrast, under a contract with her owner, resident of New York, while in the port of Baltimore, was repaired by Prendergrast, on the request of the master and the owner, with the express understanding that the repairs were so made on the credit of the steamer; supplies were also furnished her under the same conditions. For the balance due, part of the amount having been paid, Prendergrast brought a common-law suit against the owners in the state court, and while the suit was pending filed a libel for the same repairs and supplies in the federal court on the admiralty side of the docket. Judge Clifford says:

"Where it appears that the repairs and supplies were necessary to preserve the ship in port, or to enable her to proceed on her voyage, and that they were made and furnished in good faith, the presumption is that the ship, as well as the master and owner, is responsible to those who made the necessary advances, and it is clear that the necessity for credit must be presumed where it appears that the repairs and supplies were ordered by the master, and that they were necessary for the ship, unless it is shown that the master had funds or that the owner had sufficient credit, and that the repairers, furnishers, or lenders of the money knew these facts, or one of them,  *  *  *  subject to those conditions, the master, in the absence of the owner, is vested with the authority to order necessary repairs and supplies; but it is no objection to his authority that he acted on the occasion under the express instructions of the owner, nor will the lien of those who made the repairs and furnished the supplies be defeated by the fact that his authority emanated from the owner, instead of being implied by law. When the owner is present, the implied authority of the master for that purpose ceases; but, if the owner gives direction to that effect, the master may still order necessary repairs and supplies, and if the ship is, at the time, in a foreign port, or in the port of a state other than that to which she belongs, those who made the advances will have a maritime lien, if they were made on the credit of the vessel.  *  *  *  Implied liens, it is said, can be created only by the master; but if it is meant by that proposition that the owner, or owners, if more than one, cannot order repairs and supplies on the credit of the vessel, the court cannot assent to the proposition, as the practice is constantly otherwise."

This decision is of controlling authority because of the fact that the court reversed the decision of Chief Justice Chase, sitting on the circuit, and, as he stated, against his own opinion, followed the decision of the Supreme Court in The Laura (Thomas v. Osborn) 19 How. 22, 15 L. Ed. 534, and The Sultana (Pratt v. Reed) 19 How. 359, 15 L. Ed. 660. So, in the Patapsco, 13 Wall. 329, 20 L. Ed. 696, Judge Davis says:

"If the credit was to the vessel there is a lien, and the burden of displacing it is on the claimant. He must show affirmatively that the credit was given to the company to the exclusion of a credit to the vessel. This he seeks to do by the form of charge in the libelant's journal and ledger. If it be conceded that these entries tend to support this position, they are far from being conclusive evidence on the subject. Entries in books are always explainable, and the truth of the transaction can be shown independent of them."

In Lower Coast Trans. Co. v. Gulf Refining Company, 211 Fed. 336, 128 C. C. A. 15, it is held that:

"One furnishing fuel to a vessel in a foreign port, under contract with a corporation operating the vessel on joint account for itself and the owner, is entitled to a maritime lien."

It is said:

"The fact that bills were made out to other parties connected with the management of the boat does not destroy the maritime lien for supplies furnished in a foreign port."

With all deference to the learned special master, I am unable to reach the conclusion that the parties—the libelants, the charterer and owner—intended to give a verbal mortgage on the steamers. This would have been very unusual and manifestly void as against the mortgage held by the Astor Trust Company. It seems that, upon a more reasonable construction, we should reach the conclusion that it was the purpose of libelants to make sure that, by having the concurrent consent or order of the owner and the charterer, the steamers would be subjected to a maritime lien for the supplies. The fact that the libelants were notified by Capt. Bussells that he had no money and could get no credit in Wilmington was conclusive evidence to them that the Coast Products Company was of doubtful credit; hence "they desired to hear from the owner of said steamers in New York before they delivered any supplies, as the said Bussells stated that he had no right to pledge the said steamers." When their attorney reached New York, Capt. Bussells stated to the owner and the charterer that Mr. Ingram was not satisfied with the financial condition of said companies, and it was then agreed that the companies were to execute notes for the supplies to be delivered by them to said steamers—said notes to bear the names of the steamers and to be indorsed by Mr. Meadows and Capt. Bussells, and that the Atlantic Phosphate & Oil Company would make the said steamers responsible for the supplies, etc., "and it was alone on this agreement that the supplies were furnished on the credit of said steamer."

[2] I am of the opinion that the reasonable interpretation of this transaction leads to the conclusion that the owner consented that the libelants should have a maritime lien for the supplies, which all parties conceded were necessary to enable the steamers to continue the work for which they had been chartered. The acceptance of the notes, unless so intended, did not operate as a payment of the account for the supplies, nor a waiver of the lien. In The Emily Souder, 17 Wall. 666, 21 L. Ed. 683, drafts were given by the master and accepted by the owner, they were protested for nonpayment, and the libels thereupon filed. Mr. Justice Field says:

"The drafts given by the captain upon the owners of the vessel in New York were not received by the libelants in discharge and satisfaction of the sums advanced. They were received only as conditional payments. Such would be the presumption of law in the absence of any direct evidence on the point; for by the general commercial law of the world a promise to pay, whether in the form of notes or bills, is not of itself the equivalent of payment. It is treated everywhere, in the absence of express agreement or local usage to the contrary, as conditional payment only."

There, as here, the acceptances were produced on the trial and surrendered for cancellation. So, in The Kalorama, supra, it was held that the institution and pendency, at the time the libel was filed, of an action in the common-law courts against the owner for the sup-

plies, did not prevent the prosecution of the libel in admiralty. In The Emily Souder, supra, it is further said:

"The fact that the vessel was, at the time the advances were made, under mortgage to the claimants, does not subordinate the lien of the libelants to the claim of the mortgagees. * * * Advanced for the security and protection of the vessel, they were for the benefit of the mortgagees as well as of the owners. If liens created by the necessities of vessels in a foreign port could be subordinated to or displaced by mortgages to prior creditors at home, such liens would soon cease to be regarded as having any certain value, or as affording any reliable security."

The position that, by filing the libels against the Portland, the libelants waived the lien on the Lawrence, I do not think tenable. All of the vessels, engaged in the joint enterprise, were under mortgage to the Astor Trust Company. It was of no interest to that company whether the claims were paid from the proceeds of the sale of the Portland or the Lawrence; in either case, the value of its security was pro tanto reduced. In no respect was the attitude of claimants changed by reason of the course pursued by the libelants. This was recognized by the attorney for the bondholders.

Upon a careful consideration of the entire case, I am of the opinion that, in accordance with the principle of maritime law laid down and applied in the cases cited and the text-books, the libelants are entitled to a maritime lien on the steamer Lawrence. As the fund has been in the registry since the sale, and the delay was caused by the course pursued by libelants, no interest will be allowed, and the cost, including one-half the allowance to the special master, of the amended intervening libel, will be deducted from the recovery. The exceptions are sustained. A decree will be drawn directing the payment of the amount due libelants, subject to a deduction of the cost charged against them. As it appears that there are no other liens upon, or claims against, the funds in the registry, from the proceeds of the sale of the steamer John L. Lawrence, and that the claimant, Astor Trust Company, is entitled thereto, the decree will direct the payment of the amount, less any cost for which it may be liable, to said trust company, or to Herbert McClammy, Esq., counsel of record.

This decree is final.