## STEPHENSON *v.* THE FRANCIS.

*(District Court, S. D. New York. September 16, 1884.)*

1. **MARITIME LIEN—SUPPLIES—CHARTER—PART OWNERS IN DIFFERENT STATES.**
     Where a ship is run by charterers, being owners *pro hac vice*, their residence only is regarded in determining the ship's "home port," and the presumptions of personal credit in regard to supplies furnished.
2. **SAME—SUPPLIES—WHERE FURNISHED.**
     If there are several equal co-owners, general or special, resident in different states, no lien will arise for supplies furnished in the state of the known residence of either.
3. **SAME—PERSONAL CREDIT—IMPLIED LIEN.**
     A known owner obtaining supplies on his personal order in a foreign port, not being master, deals presumptively on his personal credit only, and no lien will be implied unless the libelant satisfies the court, from the negotiations or the circumstances, that there was a common understanding or intention to bind the ship.
4. **SAME—PRESUMPTION—CHARGE ON LIBELANTS' BOOKS.**
     This presumption is stronger in the case of a charterer known to be bound to pay for the supplies in person, and not to charge the ship; and where material-men, knowing the above facts, furnished supplies to such a charterer on his own application, who was known to them for 25 years previous, but having no definite credit with them, and no reference was made to the ship as a source of credit, and the master gave notice that the ship was not to be bound, and the ship was not in any port of distress, and the libelants being agents to collect the freights, and other circumstances negativing a reliance on the ship, *held*, that supplies to a small amount, for the vessel's ordinary trips, at the commencement of season's business, were furnished on the charterer's credit only, notwithstanding a charge on the libelants' books to the vessel and owners, and without reference to the question of the *power* of a charterer to bind the ship for supplies, contrary to the stipulations of the charter.
5. **SAME—KNOWLEDGE OF OBLIGATION OF CHARTERERS—NOTICE.**
     The libelants, knowing the charterer's obligation to the general owners to obtain ordinary supplies on his own responsibility only, were bound in good faith to make known their dissent when he applied for supplies, if they meant to hold the ship; not having dissented then, they must be held to have acquiesced in his application in conformity with his obligation, and are estopped from afterwards asserting the contrary.
6. **SAME—NOTICE TO MASTER—SUBSEQUENT SUPPLIES.**
     Notice by the master is one of the terms on which subsequent supplies must be held furnished.

In Admiralty.

Libel to recover an unpaid balance of $322.56, for coal supplied by the libelants at Washington to the steamer Francis; this part of the bill being furnished from July 15 to July 18, 1879. The Providence & Stonington Steam-boat Company, a Rhode Island corporation, were the general owners of the steamer, and appeared and defended as claimants.

On June 30, 1879, the Francis was chartered to "Thomas Collier, of Brooklyn, N. Y., and Jos. L. Savage, of Washington, D. C.," for 90 days, for service between New York and Washington. By the terms of the charter the possession of the vessel and the control of her navigation were in the charterers exclusively; and it was thereby agreed that they should "pay all the vessel's running expenses, including   *   *   *   fuel, oil, etc., and all other expenses connected with the navigation of the steamer."

Under this charter various trips were made between New York and Washington under the direction of the charterers. The coal was all delivered to the steamer upon the personal order of Mr. Savage, one of the charterers, who was in Washington, and had been known to the libelants for 25 years. One of the libelants testified that Savage informed him a few days before the arrival of the steamer that he would want coal for her when she arrived; and that Savage either then, or shortly after her arrival in Washington, told him that he had chartered her. Nothing further was said as to the credit for the coal, and no inquiry was made as to the terms of the charter. None of the coal was purchased by the captain, or procured by his order, or through his agency. The captain testified that on July 15th he notified the libelants that by the charter the charterers were bound to pay for supplies, and that the vessel would not be liable; and he cautioned them to look out lest they had trouble in getting their pay. On that day the libelants got a payment of $115.44 from Savage, and furnished supplies amounting to $149. On the next trip they refused to supply coal unless some further arrangements as to paying them were made; and the departure of the steamer was in consequence delayed several hours. They did, however, ultimately furnish coal for that trip to the amount of $207.50, which is included in the present bill. What, if any, arrangement was made to pay them does not appear. But at some time they were made agents of the steamer for the collection of her freights in Washington, and as such agents they made collections which they did apply. On the twenty-sixth of July they refused to furnish any more coal on Savage's order, and the captain obtained from them what was needed for that trip to New York by a personal draft on the claimants' agent, which was honored. The coal was charged against "the steamer or owners," and one of the libelants testified that he sold the coal on the credit of the ship, and that the captain did not notify him of the terms of the charter, or that the vessel would not be liable.

*Beebe & Wilcox*, for libelants.

*Miller, Peckham & Dixon*, for claimants.

BROWN, J. The libelants claim a maritime lien upon the steamer for coal furnished in Washington. By the law of this country no maritime lien is allowed for repairs and supplies furnished to a vessel in her home port, *i. e.*, within the state of her owners' residence. The supplies in that case are conclusively presumed to have been furnished on the owners' personal credit, and not on the credit of the ship. Where the vessel is known to be under the control of charterers that are in the situation of owners *pro hac vice, i. e.*, are running the vessel upon their own account, their residence alone is looked to in determining the question of lien, since they are the only parties who are personally bound for supplies, and the only persons standing in the situation of owners, to whom credit can be presumed to be given. Supplies furnished in the state of the residence of such special or *quasi* owners are therefore presumed to be furnished upon their personal credit only, and the ship will not be bound. *The Golden Gate*, 1 Newb. 308; *The Norman*, 6 FED. REP. 406.

Where there are several part owners, general or special, residing in different states, I doubt whether any single rule can be adopted justly applicable to all cases. As the reason for denying a lien is the personal credit presumed to be given to the owners at their place of residence, the reason of the rule would seem to demand its application in all the states in which any of the owners reside that are known, or ought to be known, to those who furnish supplies. Such is the view expressed by HAMMOND, J., in the case of *The Rapid Transit*, 11 FED. REP. 322, 328–330.

In the case of *The Indiana*, Crabbe, 479, repairs were furnished in Philadelphia to a vessel wholly owned and registered in New Jersey. One-sixth of the vessel was sold to a resident of Philadelphia, who was then made managing owner, and a new registry of the vessel was taken out in Philadelphia; and the repairs were afterwards continued under the direction of the resident managing part owner. It was held, and it seems to me justly, that a maritime lien accrued for the repairs prior to the sale of the one-sixth, but not for the repairs that were subsequent thereto. On the other hand, if the owners of a domestic vessel hold her out as a foreign ship, supplies furnished upon the faith of the foreign ownership will be a lien, the owners being precluded from taking advantage of their own misrepresentations. *St. Jago de Cuba*, 9 Wheat. 416, 417; *The Nestor*, 1 Sumn. 75; *The Mary Chilton*, 4 FED. REP. 847. On the same principle, it seems to me, the mere residence within the state of a part owner that is unknown to the material-man, ought not to debar the latter of his lien when the vessel is registered in a different state, and the managing owner is known to reside there, and the vessel, by the name painted on her stern, apparently belongs there. Such circumstances, taken together, in the absence of notice to the material-

man of any part owner within the state, might be reasonably held, in favor of those furnishing supplies, to be practically a representation of the foreign character of the vessel, and of the foreign residence of her owners, so far as it affects a lien for supplies furnished on the faith of that fact. *The Jennie B. Gilkey*, 19 FED. REP. 127. But when two equal part owners, general or special, reside in different states, and the residence of both is known to those who furnish supplies in either state, the presumption of personal credit must apply within one state as much as within the other. Hence no lien could logically arise in either state, unless the place of the registration of the vessel were to control; and it is well settled that the place of registry is immaterial, where the actual residence of the owner is known. *The E. A. Barnard*, 2 FED. REP. 712, 716; *The Mary Chilton*, 4 FED. REP. 847; *The Golden Gate*, Newb. 308–310.

In the present case, it appears that Mr. Savage was well known to the libelants in Washington. If it were also clear that his residence was there, that fact would, consequently, require the dismissal of the libel. But both the pleadings and the evidence leave this fact undetermined. The answer alleges a charter of the vessel to Collier and Savage, "of the city of New York." The charter party introduced in evidence describes Savage as "of Washington, D. C." The libelant claims the right to rely upon the inference from the answer that both charterers resided in the state of New York. The oral testimony shows nothing concerning the actual residence of Savage, although the language of the charter-party, his presence in Washington during all these transactions, his being known to the libelants there for 25 years, and his personal order of all this coal, would afford a natural inference that his residence was there. But where the actual residence of a party is an essential condition of recovery, the description of him as "*of* a certain state," etc., has been repeatedly held insufficient. *Wood* v. *Wagnon*, 2 Cranch, 9; *Brown* v. *Keene*, 8 Pet. 112; *Abercrombie* v. *Dupuis*, 1 Cranch, 343; *Robertson* v. *Cease*, 97 U. S. 646; *Grace* v. *The American, etc.*, 3 Sup. Ct. Rep. 207.

Under the allegation of the answer, and the indefiniteness of the evidence as to Savage's residence, I do not feel warranted in determining the case on the ground of the supposed residence of Savage in Washington.

The other defenses are that the supplies were furnished upon the personal credit of the charterers; and that the latter had no power to bind the ship. There is a direct contradiction between the libelants and the captain as to his alleged notice to them on July 15th, that, under the charter, neither the vessel nor her owners were to be responsible for coal; but the libelant's subsequent conduct in refusing to supply coal until some further arrangements were made for payment, and until some money was paid them, the delay of the vessel's departure in consequence, and the subsequent refusal altogether to furnish coal on Savage's order, fall in so naturally with the captain s

testimony as to confirm his narrative. The credits on the bill are sufficient to pay for the coal furnished before July 15th, when the captain testifies that his notice was given.

The most important facts bearing on this branch of the case are the following: (1) The charterers were owners *pro hac vice*, and had expressly agreed to *pay* for such supplies, as one of the conditions of the charter; (2) the libelants, before furnishing that part of the bill now in suit, not only knew that Savage was running the vessel under a charter, but, as I think, were cautioned by the master that the ship was not to be held liable; (3) all the coal was furnished upon the personal order of Savage, one of the charterers, at what appears to have been at least his place of business, or one of his places of business; (4) in ordering and in supplying the coal, there was no intimation by either party to the other that the ship was to be bound; (5) the captain was in no way instrumental in procuring the coal, but, as I must hold, gave notice that the ship was not to be held; (6) the ship was not in any port of distress, or upon a voyage partially accomplished; the supplies were furnished at one of her ordinary ports of departure, in the course of her ordinary business, and in the presence of, and under the management of, one of her special owners.

I have found no case where, upon facts like these, a maritime lien has been sustained. There seem to me to be several grounds upon which the lien here claimed must be denied: *First,* because supplies furnished to an owner in person, not being master, though in a foreign port, are presumptively furnished upon his personal responsibility only, where, as here, there is no reference made in the negotiations between the parties to the ship as a source of credit, and no other circumstances clearly indicate such a common intention; *secondly,* because this presumption of a personal credit only in dealing with the owner is stronger where the material-man deals with a known charterer or special owner that is known to be bound to pay for the supplies himself, and is known to be bound not to charge the ship, the supplies being in the ordinary course of the ship's business at one of her regular ports of departure, and not in any port of distress, or under any circumstances that render it necessary for the vessel to continue her trips at the ship's expense; *thirdly,* because, in the absence of any necessity for the ship to continue her regular trips, good faith to the general owner, without which no lien will be upheld, does not permit the material-man to supply materials for such trips at the ship's expense, contrary to the known terms of the charter; and, *finally,* because the notice from the captain to the libelants that the ship was not to be bound, became one of the terms of sale that could not be disregarded by the libelants, upon which the materials subsequently supplied must be deemed to have been delivered.

When a known owner, not being master, procures necessary repairs or supplies in a foreign port, the question whether a maritime lien, *i. e.*, an implied hypothecation of the ship, arises therefor, must

depend upon the intention of the parties, to be gathered from all the circumstances of the transaction. *The Rapid Transit*, 11 FED. REP. 329; *The Jeanie Landles*, 17 FED. REP. 91. This is also true, doubtless, as a general proposition in reference to supplies procured on the order of the master. But there is an important difference in the two cases. When the supplies are ordered by the master, in the absence of the owner, there is presumptively a necessity for a credit of the ship to obtain them; because in a foreign port, and in the owner's absence, the master is presumably without other means; and no implied lien is ever allowed unless there be, either in fact or by presumption of law, not only a necessity for the supplies themselves, but also a necessity for the credit of the ship to obtain them. *Pratt* v. *Reed*, 19 How. 359; *The Grapeshot*, 9 Wall. 141; *The Lulu*, 10 Wall. 192; *Thomas* v. *Osborn*, 19 How. 22; *The Neversink*, 5 Blatchf. 541. But there is no presumption of law that an owner, because he is in a foreign port, including in that designation the different states of this country, is without means, reputation or credit, and has no other resource but the ship to obtain needed supplies. The reason for the *prima facie* presumption in the case of supplies ordered by the master in a foreign port does not apply, therefore, where the owner is present and orders the supplies in person; and hence no such *prima facie* presumption in the latter case has ever been recognized. Maritime liens for repairs and supplies, being secret incumbrances, are not favored. They are allowed only upon grounds of commercial convenience and necessity. In the state of the owner's residence, where he is presumptively present, or within easy communication, no mere maritime lien for repairs and supplies there furnished is by our law in any case allowed. In that case the presumption of law is conclusive that the owner or his representative is within reach; that he is able to supply his ship upon his ordinary responsibility; and that he intends to do so without burdening her with secret liens. In a foreign port, when the owner is present and procures the supplies in person, not being master, in the absence of any express reference to the ship as a source of credit, the same presumption as to the owner's means and as to his intention exists *prima facie;* but this presumption is not conclusive, as in the home port, and may be repelled by proof drawn either from the express language of the parties, or from any other circumstances satisfactorily showing that a credit of the ship was within the common intention; and when this intention appears, the lien will be sustained. This is allowed because even an owner in a foreign port may be without means, reputation, or credit, and hence may be under the same necessity as the master for making use of the credit of the ship. But, as I have said, this necessity in the case of an owner is not presumed. It must appear in proof, either from the circumstances or from the terms of the negotiation, which may afford conclusive evidence both of the intent and of the necessity. It is only when the material-man deals with the master,

or the ship's agent, or some officer of the ship by the master's sanction or acquiescence, that he deals presumptively with the ship herself, and sells to the ship upon her credit. In other cases, the common intent to charge the ship must be shown.

The above principles have been repeatedly affirmed and applied in the earlier and in the more recent decisions of the supreme court.

In *The St. Jago de Cuba*, 9 Wheat. 409, the court say:

"The vessel upon an unfinished voyage must get on. This is the consideration that controls every other; and not only the vessel but even the cargo is *sub modo* subjected to this necessity. For these purposes, the law maritime attaches the power of pledging or subjecting the vessel to material-men to the office of ship-master, and considers the owner as vesting him with those powers by the mere act of constituting him ship-master. The necessities of commerce require that, when *remote from his owner*, he should be able to subject his owner's property to that liability, without which, it is reasonable to suppose, he will not be able to pursue his owner's interests. *But, when the owner is present, the reason ceases, and the contract is inferred to be with the owner himself, on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.*"

Judge CONKLING, in his treatise on Admiralty, (page 80,) says: "To guard against possible misapprehension, it is proper to state that no lien is ever *implied* from contracts made by the owner in person;" quoting the language of the case above cited.

In the case of *Thomas* v. *Osborn*, 19 How. 22, TANEY, C. J., in a dissenting opinion, refers *arguendo* to this point as clearly settled in the marine law of this country: "If Leach," [charterer and captain,] he says, "is to be regarded as owner for the time when he was sailing the Laura under the agreement, then, by the maritime law, the repairs and supplies furnished at his request are presumed to have been furnished upon his personal credit, unless the contrary appears." Page 38. And at page 43 he says again: "But if the owner is present, and they [the supplies] are furnished to him, it is equally *well established that the credit is presumed to have been given to him personally, and no lien on the vessel is implied.*" On one part only of these propositions was any qualification placed by the judgment of the majority of the court; viz., that, when the owner is also captain, supplies furnished on his order will be deemed furnished to him in his character as captain, rather than in his character as owner. Page 29. But this very distinction clearly sustains the general doctrine above stated, else there would have been no reason for distinguishing between the character of Leach as captain and his character as owner. In that case, it will be observed, the supplies were furnished not only in a foreign port, but in a very remote one, viz., Chili; and yet this *prima facie* presumption is stated as the settled law.

In all the reported decisions where a lien has been sustained for supplies ordered by an owner in person in a foreign port, the court has found an intent by both parties that the ship should be charged,

and has placed the decision expressly upon that ground. In the cases of *The Kalorama* and *The Custer*, 10 Wall. 204, the court upheld the lien because there was an "express understanding that the repairs were made and furnished on the credit of the steamer." Pages 214, 217. In the case of *The James Guy*, 1 Ben. 112, BENEDICT, J., finds that the parties had "an agreement based upon the credit of the vessel," and "that the responsibility of the boat for the bill was a feature in the transaction recognized *by both parties* at the time of contracting the debt." NELSON, J., in affirming the judgment, says: "After a full examination of the evidence I am satisfied that it was the *intention of both parties* * * * that the mechanic or workman should look to the vessel as his security." So, in the case of *The Union Express*, 1 Brown, Adm. 537, the court finds that the libelant made the advances "upon an express understanding and agreement for a lien;" and in *The Sarah Harris*, 7 Ben. 177, it was only "in connection with all the evidence" (page 180) that BLATCHFORD, J., found that a credit to the vessel was made out. The case of *The Patapsco*, 13 Wall. 329, has nothing adverse, and is not in point. The charter was there unknown to the libelants. The charterers were a distant, foreign, and insolvent corporation, and the coal was supplied upon the requisition of the engineer of the ship and the order of the agent. The court considered the case a difficult one, but found, on the whole, that the coal should be deemed, under the circumstances, to have been furnished on the credit of the ship; observing that "the company running the steamer was a distant corporation of no established name, and without personal liability in case their enterprise should prove a failure." That case, however, was not one of an owner present, and ordering the supplies in person.

If such is the rule of law as regards the general owner ordering supplies in person in a foreign port, the reasons for this rule are still stronger in the case of a mere owner *pro hac vice*, or known charterer, who has bound himself to pay for all such supplies personally, and who has no right, as against the general owner, at least, except in case of actual necessity, to navigate the ship at her expense. As the purchase in this case was by the special owner in person, the burden of proof was, by all the above authorities, upon the libelants to satisfy the court, as in the cases above cited, that it was the intention of both parties that the ship should be bound for the coal furnished. Nothing, however, appears in the evidence indicating any such common intention. A mere charge to the ship on the libelants' books is an inconclusive circumstance, even as regards the libelants' own intention. *Beinecke v. The Secret*, 3 FED. REP. 667. The usual practice of merchants to make such charges against the vessel indifferently, whether the vessel be in her home port or not, shows that such a charge is very slight, if any, evidence of an actual reliance on the ship. In practice it is scarcely more than a habit adopted by merchants in order that their books may not tell against them, if,

in fact, they would be entitled to hold the ship. But when nothing on that subject is spoken of between the parties, a mere secret intention of the material-man to charge the ship, in no way communicated to the owner at the time, can have no weight as evidence of the common intent. The question is, what did the conversation of the parties or the circumstances of the transaction authorize the libelants to understand as the basis of furnishing the supplies? In some cases a few words or slight circumstances may clearly indicate the common intention. If an owner seeks supplies of an entire stranger in a foreign port, something will almost necessarily occur in the ordinary course of business to indicate whether the intention is to rely on his personal credit or on that of the ship also. If such an owner should say, "I am a stranger to you, but you can trust the ship," or, "You have the security of the ship," no question could arise that a lien would be implied. If such an owner, on the contrary, should give references as to his responsibility, and opportunity for inquiry, and inquiries were made and supplies afterwards furnished without any allusion to the ship as security, it is equally clear that no inference of a common intention to procure supplies on the credit of the ship could be sustained. In the present case, Savage, one of the special owners, was not a stranger to the libelants. He had been known to them for 25 years. He applied to them several days before the steamer first arrived, and told them, not that the ship would need supplies, but that *he* should want coal for the steamer. No allusion was at any time made to the steamer as a source of credit. On the contrary, the libelants were told either then, or when the steamer arrived, that she was run under charter. The libelants, from knowledge of that fact alone, could not have failed to understand, as business men, that the charterers, and not the owners, were bound to pay for the necessary supplies for her ordinary trips in running between New York and Washington. The urgent means resorted to by the libelants to compel payment by Savage while the bill was still quite small; their refusal to supply coal unless payments on account were made; the delay of the vessel's departure in consequence; their obtaining the agency for the collection of freight; and their final refusal altogether to furnish more coal,—are all opposed to a reliance on the credit of the ship.

Again, this case was not one of any actual maritime necessity, such as that of *The City of New York*, 3 Blatchf. 189, where, as NELSON, J., finds, the vessel was in a port of distress, on an unfinished voyage; and where, consequently, the interests of the general owners required that the ship should be hypothecated, if necessary, in order to complete her voyage, and thereby cancel her own obligations and the liens of freighters to a much greater extent than the mere cost of the needed supplies. See, also, *The Monsoon*, 1 Spr. 37. Here the supplies were in the usual course of navigation, from one of the specified ports of departure named in the charter; they were supplies that

were plainly within the express contemplation of the charter, and for which it was specially agreed that the charterers should *pay*, for the very purpose of preventing the ship from being burdened with them. Not only were the libelants put upon inquiry so as to be chargeable with knowledge of these facts through their information at the outset that the vessel was run under charter,—a fact which would, itself, naturally import all the above provisions,—but they were, as I think, specially cautioned by the master on this subject. This knowledge and these cautions make their subsequent conduct natural and consistent. They explain the urgent means to which the libelants resorted to compel Savage to pay as he went along, though the bill for coal was yet small; their refusal to supply coal except on partial payments; the consequent delay of the steamer's departure; their appointment as agent to collect the freights; and their final refusal to supply coal at all except for cash on delivery. These circumstances are not consistent with a reliance on the steamer for their payment, or with any belief on their part that they had a right to look to her as security for the debt. Moreover, had either the libelants or Savage, at that time, had any idea that the ship was to stand as security for such supplies, it is almost incredible that, in the interviews with him during the troubles and delays above referred to, no allusion to that security should have been mentioned; nor would the libelants naturally have waited nearly 15 months before libeling the ship for payment. The libelants testified that Savage had not had any credit with them.' By this I understand credit in the ordinary sense of merchants, *i. e.*, for any definite or considerable period. There was not any definite credit. They could sue him at any moment. They expected payment to be made by Savage speedily, from trip to trip, and they became agents of the freight as a means of securing payment. They would trust Savage and his new enterprise for a few days, and for a small amount, but no further; and hence, after a little, they refused any further trust, and demanded payment on delivery. The circumstances, altogether, both affirmatively and negatively considered, show clearly, as it seems to me, that it was fully understood and recognized by both parties that Savage, in ordering the coal, was ordering it on his personal account, and on the credit of his enterprise, not on the credit of the ship. The express terms of the charter bound him to do so; the libelants knew it. And, when he ordered the coal in person, the legal presumption is, where nothing to the contrary appears, that he ordered it in conformity with, and not in violation of, his known obligations to the general owner. The libelants, knowing these facts, and furnishing the coal without any claim at the time of the security of the ship, must be held to have acquiesced in supplying it according to the known obligation of the charterer, and according to his evident intention, *i. e.*, on his personal credit only. Where material-men furnish ordinary supplies to a known charterer in person, who is running a vessel upon short

trips, and they know, or are chargeable with knowledge of, his obligations to the general owner to pay for the supplies himself and not to charge the ship therefor, it seems to me but reasonable to require that the material-men, if they do not mean to furnish supplies except on the credit of the ship, should, at least, make that fact known, unless other circumstances make the common intent so clear as to dispense with the need of any express mention of this source of credit. No such circumstances here exist. The supplies were furnished at the beginning of a season's run. The material-men contemplated a season's business with the ship. Knowing that she was run by a charterer, they could not reasonably have imagined that the vessel was to be run through the season at the ship's expense; and there was no reason why she should be held for either of these trips' supplies any more than for the whole season's supplies, if the charterer did not pay for them as he went along. A good business reason existed for the libelants' not mentioning any claim of credit to the ship, viz., because, if that had been done, Savage would doubtless have gone elsewhere for his coal, as his known duty to his general owner would have required him to do. Not having made any claim of credit to the ship at the time, when good faith to Savage and to the general owners required the libelants to make this condition known in case they intended any such credit as a condition of furnishing the coal, they should be held estopped from asserting this claim afterwards.

Again, the ship in this case was under no necessity of proceeding upon her new trips, for which this coal was furnished. Savage, by his charter, had no right to pursue her ordinary navigation at the ship's expense. If he could not fit her out for her trips without resorting to her own credit, having no right to use that credit for ordinary supplies, it was his duty to surrender her, or, at least, not to run her until he could arrange to do so without a violation of his agreement with the owner. There was no commercial necessity that she should depart upon this trip; and the general owner had no interest that she should be navigated except according to the terms of the charter. In this respect the case is wholly different from that of *The City of New York*, 3 Blatchf. 189, where the vessel was in a port of distress, on an unfinished voyage, and where the interest of the ship and of her general owner also required the supplies. Broadly considered, therefore, the first requisite for a lien, viz., a necessity for the supplies, did not exist. Had Savage, being under no necessity to continue the vessel's trips, and not being in any port of distress, expressly contracted for ordinary supplies on the ship's credit, this would have been a clear wrong to the general owner, and a violation of the terms of the charter, because the stipulation of the charter was for the very purpose of preventing this. The language of the supreme court in the case of *Gracie* v. *Palmer*, 8 Wheat. 605, 639, would in that case seem to be applicable. "The charterer," the court say,

"has contracted with the shipper [here the material-man] to do an act which he could not perform without violating his own contract with the ship's owner; and he must therefore be considered as having *entered into a contract subordinate in its nature to that previously existing between the owner and charterer.*" And this was approved in *The Freeman* v. *Buckingham,* 18 How. 182. In the case last cited CURTIS, J., also expressly limits the effect of the ordinary maritime usages to "contracts * * * entered into with a person who has no notice of any restriction." Page 490. But, in the present case, Savage clearly had no intention of violating the charter, or of obtaining supplies on the ship's credit, and the question of his *power* does not, therefore, properly arise in this case. The notice, moreover, given by the captain to the libelants, was of itself one of the terms upon which the coal was supplied. The captain is the person who in a foreign port specially represents the ship and all interests combined. When he gives notice that the ship is not to be bound for supplies, that becomes one of the terms on which any supplies subsequently delivered must be deemed furnished, and which estop the material-man from asserting the contrary. Considering the knowledge of the charter that the libelants possessed, as well as this notice from the captain, and the fact that the supplies were for the ship's ordinary use, and not under the stress of any maritime necessity, or in a port of distress, the obligations of good faith, without the observance of which no lien is sustained, estop the libelants from asserting any credit to the ship, or holding her answerable. *The Lulu,* 10 Wall. 201; *Thomas* v. *Osborn,* 19 How. 46; *The Neversink,* 5 Blatchf. 541; *The Grapeshot,* 9 Wall. 141; *The Woodland,* 7 Ben. 120; *The Columbus,* 5 Sawy. 487; *The S. M. Whipple,* 14 FED. REP. 354; *The Wm. Cook,* 12 FED. REP. 919.

There being apparently some differences in the views expressed in recent cases in the circuit court of this district, as regards the *power* of a charterer to charge the ship for supplies contrary to his stipulation in the charter, (*The Secret,* 15 FED. REP. 480, followed in *Beinecke* v. *The Secret,* and *Maxwell* v. *The Same,* 3 FED. REP. 665–667; *The India,* 16 FED. REP. 262,) although possibly these differences may be harmonized by the distinction between supplies furnished in the ordinary course of navigation and those furnished under circumstances of actual necessity, as in a port of distress, like the case of *The City of New York, supra,* I make no reference to the mere question of the charterer's *power,* but place my decision exclusively upon the grounds above mentioned, viz., the dealings with the charterer in person, and the absence of any understanding or agreement for a credit of the ship; and upon those grounds the libel must be dismissed; but as the case presents features of uncertainty on the pleadings, as well as on some of the facts, the dismissal will be without costs.

See *The Gen. Meade,* 20 FED. REP. 923.