The Glenmont.[1]

Hansen *et al. v.* The Glenmont *et al.*

(*Circuit Court, D. Minnesota.* March 13, 1888.)

MARITIME LIENS—SUPPLIES—HOME PORT.
 A month after the hull of the steam-boat was built and the propelling power put in, the libelants furnished her with stores, fuel, tiller-line, check-line, copper wire, packing for machinery, pails for roof, beds and bedding, etc. These articles were supplied the day before the vessel made her trial trip, and at the request of one R., who was a resident of Iowa, where she was built, and who, with G. and H., residents of Minnesota, owned her. R. also superintended the construction of the boat, and was to be and was her master. The vessel was temporarily enrolled at Dubuque, where she was built, but her per-

[1]Affirming 32 Fed. Rep. 703.

manent enrollment was made at St. Paul, Minn., when she reached that place, two days after she received her outfit. *Held*, that the libelants were not entitled to a lien for what they had furnished, the purchase having been made by the owner in the home port.

In Admiralty. Appeal from district court.
*Dan. W. Lawler*, for appellants.
*Clark, Eller & How*, for respondents.

Brewer, J. This is an appeal from the decree of the district court dismissing a libel. The facts are these: The libelants were merchants in Dubuque, and furnished all the goods and material for which this libel was filed. The steam-boat Glenmont, to which all these articles were delivered, was built at Dubuque in the spring of 1885. The larger part of the goods were delivered on or before April 23d. On that or the day before the boat made its trial trip, and was temporarily enrolled at Dubuque. Her permanent enrollment was at St. Paul, two days thereafter, April 25. She was built by Harper and Gillespie, who resided in Minnesota, and Romans who lived in Iowa, each owning one-third. The goods were ordered by Romans, who superintended the completion of the boat, and was to be and was its master. The district judge dismissed the libel, on the ground that the materials furnished were part of the original construction, and necessary to complete the vessel and make it serviceable for navigation; holding that because of this fact no maritime lien existed, citing: *Ferry Co.* v. *Beers*, 20 How. 393; *Roach* v. *Chapman*, 22 How. 129; *Morewood* v. *Enequist*, 23 How. 491; *Edwards* v. *Elliot*, 21 Wall. 532; *The Pacific*, 9 Fed. Rep. 120; *The Count de Lesseps*, 17 Fed. Rep. 460; *The Norway*, 3 Ben. 163. Of the correctness of the general proposition that no maritime lien exists on a contract for building a vessel, or for furnishing materials for such building, or the supply of machinery for the original construction, or work done thereon, there can be no doubt. The cases cited abundantly establish that; and I think it clear from the testimony that a portion of the articles for which this libel was filed came within that rule. It may be doubted whether that is true of all or whether some of the articles were not rather supplies furnished to the vessel after its completion, and while it was engaged in navigating the Mississippi. Still, I think the decree of the district court dismissing the libel *in toto* was right, for one, if not more, reasons. As already stated, Romans was one of the owners. He was the master of the vessel, superintended the construction, and ordered these goods. He was a resident of Iowa, the state in which the boat was built, and in which the articles were furnished, and where the boat was first and temporarily enrolled. It is true that in the permanent enrollment, Gillespie, of Minnesota, was stated to be the managing owner, but this is only *prima facie* evidence, and from the testimony in the case it would rather seem that Romans was the manager. Be that as it may, he was a joint owner, and Dubuque must be considered as a home port.

It further appears that libelants had business dealings with Romans for many years, and regarded him as good, and that when he contracted

for these goods he told libelants that they would have to wait for their pay until he had made some money with the boat. It also appears that they regarded all .of the owners of the boat as good, and that after the boat was sold in August, 1885, they made no attempt to collect the bill from the boat until some time after Harper and Gillespie had failed, and assigned for the benefit of their creditors, on November 25, 1885. Now, upon these facts, I remark that it seems to be settled that where goods are ordered by an owner in the home port, no maritime lien is created, and while, upon the authorities, it may not be so clear, yet I think that Dubuque must also be declared to have been a home port. See cases of *Pratt* v. *Reed*, 19 How. 359; *The Rapid Transit*, 11 Fed. Rep. 322; and *Stephenson* v. *The Francis*, 21 Fed. Rep. 715. The first case, while not directly in point, for there the supplies were not purchased at the home port, yet in its line of remark it is very pertinent. I quote these observations of the court:

"Now, the supplies having been furnished at a fixed place, according to the account current, and apparently under some general understanding and arrangement, the presumption is that there could be no necessity for the implied hypothecation of the vessel; there could be no unexpected or unforeseen exigency to require it. For aught that appears, the supplies could have been procured on the personal credit of the master, and in this case especially, as he was the owner. We do not say that the mere fact of the master being owner, of itself, excludes the possibility of a case of necessity that would justify an implied hypothecation; but it is undoubtedly a circumstance that should be attended to in ascertaining whether any such necessity existed in the particular case. *The Sophie*, 1 W. Rob. 369. These maritime liens, in the coasting business, and in the business upon the lakes and rivers, are greatly increasing, and, as they are tacit and secret, are not to be encouraged, but should be strictly limited to the necessities of commerce which created them. Any relaxation of the law in this respect will tend to perplex and embarrass business, rather than furnish facilities to carry it forward."

The last case is very clearly in point, and the opinion, which is full and elaborate, is very satisfactory. I quote some observations made by the learned judge in that case:

"Maritime liens for repairs and supplies, being secret incumbrances, are not favored. They are allowed upon grounds of commercial convenience and necessity. In the state of the owner's residence, where he is presumptively present, or within easy communication, no mere maritime lien for repairs and supplies there furnished is by our law in any case allowed. In that case the presumption of law is conclusive that the owner or his representative is within reach; that he is able to supply his ship upon his ordinary responsibility; and that he intends to do so, without burdening her with secret liens. In a foreign port, when the owner is present, and procures the supplies in person,—not being master,—in the absence of any express reference to the ship as a source of credit, the same presumption as to the owner's means, and as to his intention, exists *prima facie;* but this presumption is not conclusive, as in the home port, and may be repelled by proof drawn either from the express language of the parties, or from any other circumstances satisfactorily showing that a credit of the ship was within the common intention; and when this intention appears the lien will be sustained. This is allowed because even an owner in a foreign port may be without means, reputation, or credit, and hence may be under the same necessity as the master for making use of the

credit of the ship. But, as I have said, this necessity in the case of an owner is not presumed. It must appear in proof, either from the circumstances, or from the terms of the negotiation, which may afford conclusive evidence both of the intent and of the necessity. It is only when the material-man deals with the master, or the ship's agent, or some officer of the ship by the master's sanction or acquiescence, that he deals presumptively with the ship herself, and sells to the ship upon her credit. In other cases the common intent to charge the ship must be shown."

Beyond the fact of this being in the home port, the transactions between the libelants and Romans leave it certainly a matter of doubt whether the sales were made really upon the credit of the boat, and not in pursuance of the general credit which Romans had acquired by virtue of his past dealings. However, I place my decision rather upon the ground just noticed, of the purchase by the owner in the home port. It is unnecessary to add more, and the ruling of the district court was right, and a decree will be entered dismissing the libel at libelants' costs.