SPEDDEN et al. v. KOENIG et al.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1897.)

No. 180.

SHIPPING—SUPPLIES—LIABILITY OF PART OWNERS.

In the home port, where all the owners reside, the managing owner, though registered as such at the customhouse, cannot, merely by virtue of that relation, order supplies, and bind his co-owners to a personal liability therefor; nor do they become liable merely because the creditor, on his books, charges the supplies against the vessel "and owners."

Appeal from the District Court of the United States for the District of Maryland.

This was a libel in admiralty by Robert M. Spedden and Harvey E. Birch, trading as Spedden & Birch, in personam, against George Koenig and Nicholas R. Ford, part owners of the steam tug May Russell, to recover for supplies furnished for her use. The circuit court dismissed the libel, and the libelants have appealed.

Robert H. Smith, for appellants.

Beverly W. Mister, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. The libelants, who were engaged in the business of machinists and steamship supplies in the city of

Baltimore for some years prior to the date of the filing of this libel, furnished supplies to one Phillips, who built, owned, and managed several tugs, among them the May Russell, which was completed about August 1, 1893; and one-half interest in this tug was then sold to one Koenig, in pursuance of an agreement made with Phillips, that he would buy a half interest in one of the tugs which were then building. About the same time, one Ford loaned Phillips some money, taking a bill of sale of one-fourth of said tug as security. Phillips afterwards repaid Ford a part of the amount loaned, and in the autumn of 1895 Koenig's wife purchased this one-fourth interest, and took a bill of sale from Ford. The tug was enrolled, and papers issued to Phillips, as managing owner, in compliance with the Revised Statutes, requiring managing owners to give a bond of indemnity to the government against any frauds under the revenue laws. A part of the supplies (about one-fifth of the entire amount claimed) were furnished prior to August 1, 1893; the remainder between that date and the summer of 1895, during which period Phillips, by an agreement between himself and Koenig, had the use, employment, and earnings of the tug for his own benefit. No profits were made, and Koenig and Ford received no part of the earnings. All of the parties were residents of Baltimore, and acquainted with each other. The supplies were furnished to Phillips, and charged on the books of the libelants to the "May Russell and owners." Phillips, during this period, was the owner and manager of other tugs, supplies for which were bought from the same parties. In making his settlement, it is in evidence that he at one time directed that a small amount of money paid in should be credited to the account of the May Russell; but, at the request of the libelants, he consented that it should be applied to other indebtedness. Phillips became embarrassed in the summer of 1895, and in the autumn of that year the May Russell passed into the possession of Koenig. There is no question of the liability of Phillips, and the court below has entered a decree against him; but it appears that he is insolvent, and it is clear that the supplies were such as were necessary for the use of the tug in the business for which she was built. The only point for decision is whether Koenig and Ford are liable. The district court has held that they were not. Hence this appeal. There is no proof that Koenig or Ford had any knowledge that Phillips was ordering these supplies from the appellants, or that he had any authority from them to buy them or to pledge their credit, or that the appellants ever consulted them, or made known the fact, or demanded any payment from them until after Phillips became insolvent.

It is well settled that, by the law of this country, no maritime lien is allowed for supplies furnished to a vessel in her home port; and it is conclusively presumed that they are furnished upon the owner's personal credit, and it is equally well settled that co-owners of ships are not partners. Their relation to each other is that of tenants in common, where each is severally liable upon his own contract. As between partners, the relation of principal and agent

is implied by law; between part owners it must be proved,—the only modification of this rule being the implied authority of part owners on the spot to order for the common concern whatever may be necessary for the preservation or proper employment of the ship, the other owners being absent; but in the home port, where all the owners reside and are easily accessible, no such authority to bind the ship can be presumed. The presumption in such cases is that the supplies are furnished upon the personal responsibility of the owner. Whether the owner has authority to bind his co-owners for such supplies is a question of fact to be determined in each case by the circumstances. The fact that Phillips was registered in the customhouse as managing owner does not of itself imply authority by his co-owners to use their credit. Such registry, required by section 4320 of the Revised Statutes, is requisite to the licensing of vessels for the coasting trade or fisheries, and demands that the managing owner shall enter into bond, with sureties, to indemnify the government against the vessels being employed in any trade whereby the revenue of the government may be defrauded. It neither enlarges, diminishes, defines, nor affects the relations of the owners towards each other. It is required simply to enable the government to have some responsible person of whom it can require compliance with its revenue laws, and cannot be construed so as to create such managing owner a plenipotentiary of the other owners for purposes with which the government has no concern.

The function and authority of the "managing owner" being thus limited to the purposes and provisions of the statute, we must look elsewhere for his authority and rights towards his co-owners and persons dealing with him. "In respect to repairs and necessaries in the port or state to which the ship belongs," says Mr. Justice Story in The General Smith, 4 Wheat. 443, "the case is governed altogether by the municipal law of that state, and no lien is implied, unless it is recognized by that law."

The law of Maryland is settled by Pentz v. Clarke, 41 Md. 338:

"The later decisions hold that no implied authority arises from the relations of master and owner per se to bind the owner in the home port; but that, in order to bind such part owner, the master must have special authority for that purpose, or the owner must have held out the master as having such authority, or he must have ratified the contract after it was made."

In the purchase of supplies alleged to be necessary, the managing owner would have no greater authority than the master, as the principle which governs in such cases is the same.

Scull v. Raymond, 18 Fed. 547, was a libel in personam, wherein it was sought to hold a part owner of a steamer liable for damages caused by collision. In that case the steamer which was in fault was in the exclusive possession and control of other part owners. In deciding that Raymond was not liable in consequence of being a legal part owner, Judge Brown says:

"The primary relation of part owners of ships to each other is that of tenants in common of chattels. By the common law one tenant in common having possession of a chattel may use it for his own exclusive benefit, and, while so doing,

he alone is liable for all charges affecting it. This rule as applied to ships has been so far modified as to entitle each part owner to receive his share of the earnings of the vessel, unless he has dissented from the voyage. Prima facie, therefore, the master or ship's husband, or the managing owner, is the agent of all the part owners in the ordinary business of the ship, and all will be prima facie liable for necessary repairs, supplies, and for torts of navigation, because, presumptively, the voyage is for the benefit of all. But this presumptive agency and benefit, and consequent liability, may be rebutted by any appropriate proof. And when it affirmatively appears that any one part owner was neither intended to be represented by the master in the navigation of the ship, or in ordering repairs or supplies, and that he never authorized the master to represent or bind him, and that he never ratified or adopted the voyage, but dissented from it, there is no reason or legal principle upon which he can be held for the supplies ordered or for the torts of the voyage. * * * If a part owner expressly dissent to repairs or supplies, he is not personally bound. The implied authority of the master to bind him is in such cases rebutted by proof of the dissent; and, if the material man had no previous dealings with the dissenting owner, the notice of dissent need not even be brought home to him."

After citing several cases in support of the view that owners are not personally bound for supplies unless they expressly authorize them or participate in the profits of the voyage, he says:

"These several classes of cases show one principle running through them all, namely, that the personal responsibility of a part owner does not necessarily attach as an incident to his naked legal ownership, but depends upon the possession, use, and control of the ship."

It does not appear that this case ever went to the supreme court. Thorp v. Hammond, 12 Wall. 410, was decided by the same learned judge, and his decree, confirmed by the circuit court, was affirmed; the supreme court being equally divided. That also was a case of collision. The schooner at fault was commanded, sailed, and exclusively managed by Hammond, one of the owners, under an arrangement made between him and the other owners, whereby he had, in effect, become the charterer, retaining one-half the net freight after expenses were taken out, and paying to the general owners the other half. It was contended that all the general owners were liable for the torts committed by the schooner while she was thus let to charter. The court below was of opinion that they were not. The supreme court was equally divided on that question, but all held that the owner pro hac vice was liable.

Thomas v. Osborn, 19 How. 22, held that the power of a master or charterer or owner pro hac vice to create a lien upon the ship in a foreign port for repairs or supplies was limited to cases of necessity, and that it is the duty of the lender to see that the necessity exists, and that where the freight money was sufficient to pay for repairs and supplies, and might have been commanded for such use if it had not been diverted by the master, with the assistance of the parties making the advances, they had no lien. And that such power in the master or owner, pro hac vice, "does not exist in a place where the owner is present."

The St. Jago de Cuba, 9 Wheat. 416, holds that the necessities of commerce require that, when remote from the owner, the shipmaster should be able to subject the owner's property to liability for repairs and supplies, without which it is reasonable to suppose he

will not be able to pursue his owner's interest, but, when the owner is present, the reason ceases.

We take the true rule, then, to be that in the home port, where the owners are resident and easily accessible, the master, or managing owner or charterer, or owner pro hac vice, cannot purchase supplies that will bind the ship or make the owners personally responsible without some authority, express or implied, and that such authority to the managing owner from the other owners cannot be implied from the mere fact that they are co-owners. "Title has nothing to·do with these cases," says Lord Ellenborough in Annett v. Carstairs, 3 Camp. 354. "We must look to the contract between the parties."

In the case before us it is earnestly contended that all the owners are responsible for these supplies—First, because they were charged to the "tug May Russell and owners"; second, because Phillips was registered as the managing owner,, and is to be presumed to have had authority to purchase on the credit of her owners such supplies as were necessary and proper for her use. In Beinecke v. The Secret, 3 Fed. 665, supplies were furnished to Murray, Ferris & Co., charterers of The Secret, a foreign vessel, and the goods were charged on the books of libelant to "steamer Secret and owners." It was held that credit was given to Murray, Ferris & Co.; that libelants were put upon inquiry as to the interest of the charterers, and could easily have learned that Murray, Ferris & Co. had no right or power to bind the vessel or her owners for supplies, and had no lien upon the vessel. "A mere charge to the ship on libelant's books," says Judge Brown in The Francis, 21 Fed. 722, "is an inconclusive circumstance, even as regards the libelant's own intention. The usual practice of merchants to make such charges against the vessel indifferently, whether the vessel be in her home port or not, shows that such a charge is very slight, if any, evidence of an actual reliance on the ship. In practice, it is scarcely more than a habit adopted by merchants in order that their books may not tell against them, if, in fact, they would be entitled to hold the ship." As it is not claimed that Koenig or Ford had any knowledge of this entry, it must be regarded as a' mere matter of bookkeeping, a self-preserving practice on the part of the creditor, or, at most, as evidence of a secret intention to hold them, which, not being communicated to them, can have no weight as evidence against them.

We have already considered the effect of the registry of Phillips as managing owner, and.have determined that that fact alone cannot be looked to as defining the nature and extent of his powers. There is no magic in the term "managing owner," as used in circumstances like these, which would confer upon him powers and rights which otherwise did not exist to bind personally his co-owner. The right of one owner to bind another not springing from operation of law, and not being deducible from mere naked proof of title, it was necessary for libelants to prove either authority conferred, or participation in profits, or·such a course of dealings as would warrant the inference that authority previously given was

continued, or ratification. No such proof was offered. On the contrary, it may fairly be presumed that credit was given to Phillips alone. There was evidence that, during the time that the supplies were furnished, he was running the vessel on his own account, under an agreement with Koenig that he (Koenig) was not to be responsible for any debts, and Koenig received no part of the earnings during that period. There was no evidence of any act, representation, or course of dealing on the part of Koenig or Ford, or either of them, from which it could legally be inferred that they had clothed Phillips with authority to bind them. They were readily accessible, were seen nearly every day, and nothing was said to them from which they could reasonably infer that any credit was given to Phillips on their account. There are other and special considerations affecting so much of the indebtedness as was contracted prior to August 1, 1893, and as relates to Ford; but our conclusion renders any determination of them unnecessary. The decree of the district court is affirmed.