THE ROANOKE.

(District Court, E. D. New York. April 27, 1900.)

1. MARITIME LIENS—REPAIRS—CONTRACT WITH OSTENSIBLE OWNER.

A corporation having its place of business in New York chartered a steamer in service on the Lakes with an option to purchase, stipulating to place and keep her in repair. It had the vessel taken to New York, where it delivered her to libelant for such alterations and repairs as would fit her for ocean service, stating that it had purchased her. After she had been placed in dry dock, and such removals made from her hull that she could not be floated without some restoration, and libelant had contracted for the materials for her repair, it was notified by the owner not to make any repairs on the credit of the vessel. Held, that libelant was justified in regarding the charterer as the owner, and that the notice from the owner did not affect its right to a lien, if such right existed, for the work it had previously done, or such as was necessary to be done before the vessel could again be safely floated.

2. SAME—CONTRACT WITH OWNER—PRESUMPTION.

Libelant, by direction of a corporation as owner, undertook the repairing of a vessel at New York, where the contract was made, and where the corporation had its office and transacted all of its business, although it was incorporated under the laws of another state, of which fact libelant had no knowledge. Held, that the presumption was under such circumstances that the contract was made upon the general credit of the corporation, and that the burden rested upon the libelant, in order to establish a maritime lien, to prove an agreement or a common understanding between the parties that the work was to be done on the credit of the vessel.

In Admiralty. Suit to enforce a maritime lien for repairs.

Peter S. Carter, for libelant.
Cowen, Wing, Putnam & Burlingham, for claimant.

THOMAS, District Judge. The Manhattan Steamship Company, deriving its franchise from, and hence technically resident of, the state of New Jersey, but having its headquarters and residence for the conduct of its business in the city of New York, chartered, with an option to purchase, the steamer Roanoke, from the owner, who was a resident of the state of Indiana. The charterer stipulated to make and to keep the vessel in repair, and for certain initial repairs the charter provided that $4,000 might be deducted from the first installment of hire, and for the three weeks within which the repairs thus contemplated should be in progress no charter money was to accrue. The vessel was adapted to service on the Lakes, and required extensive alteration for the ocean service, for which it was chartered. The general manager of the Manhattan Company, at the offices of the company in the city of New York, had a conversation with the president of the libelant, a resident of the same city, with reference to repairs, and at such time stated to the latter that he had purchased three ships on the Lakes, and that the Roanoke had been ashore, and hence needed some repairs. About a week thereafter the vessel came to the libelant's dock, and the libelant undertook the work on her hull which was necessary to keep her usefully afloat. The vessel was delivered to the libelant on the 4th of January, and on that day some preparation was made to begin the work, and on January 5th the work was actually begun, with the vessel on the dry dock. While the libelant's workmen were engaged on the hull of the vessel, and at about 11 o'clock of January 5th, a representative of the owner appeared, and gave notice that the ship was under charter to the Manhattan Company, and forbade the libelant to continue the work on the credit of the ship; and a similar notice on the morning of the same day was mailed to the libelant from New York. Thereupon the libelant's president communicated with its counsel, and also with the general manager of the Manhattan Company, and he told the latter that he could not proceed with the work. The vessel at that time had been placed on the dry dock at the libelant's expense, and contracts for the material needed for the repairs had been made. The libelant continued and completed the work, and demanded payment of the bill from the Manhattan Company. However, payment was not made, and such company went into bankruptcy a few months thereafter. The conclusion is reached that the Manhattan Company was, as to the libelant, the owner of the ship, and that there was no fact or circumstance that required the libelant to use greater care than it did for the purpose of discovering whether the ship was owned by the Manhattan Company or whether it was under charter. It is also concluded that, if the work was undertaken on the credit of the ship, the libelant was privileged to continue the work to the extent that it did. It had received the vessel, placed her on the dry dock, and made such removals from her hull that she could not be floated without some restoration. The owner gave

his notice to stop the work on the credit of the ship, and departed. What could the libelant do? If it stopped, and left the vessel on the dry dock, the expense thereof, rapidly increasing, fell upon it, for it had engaged this service. If the libelant put the ship in the water, she would sink, and it would thereby perchance lose its compensation for services justly rendered, provided it had a lien on the vessel. A person rightfully undertaking work on the credit of a vessel may not be placed in this dilemma, and the law does not place him in such jeopardy. If the libelant did have the right to undertake the work, it also had the right at least to restore in a good workmanlike manner the vessel so that she could be taken on the dry dock, and floated with safety; and for the value of such work the libelant would have a maritime lien, if it were entitled to a lien at all. The libelant contends that it did this precise thing, and nothing more, and that the bill for repairs which is the subject of this action is for just that necessary work. Of this there was, on the trial, some doubt entertained and expressed by the court; but no evidence tending in a contrary direction has been given, and therefore the evidence of the libelant's witnesses is accepted. If the work was done on the credit of the ship, the libelant should have judgment for the bill of repairs as rendered by it. But was the work done on the credit of the ship? The charterer must be regarded as the owner of the vessel, nonresident of the state where the work was contracted and where the alleged lienor lived, but having its principal headquarters in the latter state. Thus the work was done upon a contract made directly between the owner and the libelant, at the place where the owner's chief place of business was, and to which place all its credit and property related, save its naked corporate franchise. There is no fact or circumstance tending to show that the work was done upon the credit of the vessel. Nor does there seem to be any fact or circumstance tending to show that it was not done upon the credit of the vessel. An order was given by the general manager of the company to repair the ship by day's work. The libelant accepted the order and proceeded with the work. After learning that the vessel was owned by the company, and had recently been purchased, with other vessels, on the Lakes, which statement the hailing name Chicago on the stern tended to confirm, the libelant went ahead with the work upon the receipt of the vessel. That was, in brief, the transaction. The simple question here is, where is the presumption, or upon whom is the burden to show, that the work was done upon the credit of the ship or otherwise?

In The Aeronaut, 36 Fed. 497, Judge Brown states as follows:

"But upon personal dealings with the general owners, or with charterers who are owners pro hac vice, for supplies to be furnished within the same port or state where the contract is made, the legal presumption is that the dealings are not with the ship, or upon her credit, but upon the ordinary personal responsibility of the owners, with whom the dealings are had; and no lien is, in such a case, sustained, unless a credit of the ship is proved to be within the intention of both parties, as was specially found by the court in the cases of The James Guy, 1 Ben. 112, Fed. Cas. No. 7,195; Id., 5 Blatchf. 496, Fed. Cas. No. 7,196, and 9 Wall. 758, 19 L. Ed. 710; and The Kalorama, 10 Wall. 204, 19 L. Ed. 944. This subject, and the previous authorities bearing upon it,

were fully considered by this court in the cases of Stephenson v. The Francis, 21 Fed. 715, 719–723, and Neill v. Same, Id. 921. The same principles have been affirmed in numerous later cases in the courts of other circuits and districts. The Norman, 28 Fed. 383; The Mary Morgan, Id. 196; The Cumberland, 30 Fed. 449; The Pirate, 32 Fed. 486; The Glenmont, 34 Fed. 402, 404; The Kingston, 23 Fed. 200. The libelants' dealings in this case were al\* directly with the charterers in person. There is no legal presumption that aids the libelants in making out a maritime lien. They must stand upon the facts as they existed; and upon these facts not only had the charterers, under the circumstances of this case, no authority to charge the ship for these supplies, but there is no evidence that they had the slightest intention of doing so. Nothing in the negotiations or in the ordering of the supplies points to the ship as an intended source of credit within the common intention, and the charterers could not have contracted on that basis in this case without fraud on the general owners."

In what manner shall the case at bar be differentiated from The Aeronaut, and in what respect is the language of the learned judge in that case inapplicable to the facts in this case?

In The Stroma, 3 C. C. A. 530, 532, 53 Fed. 281, 283, Judge Shipman states as follows:

"It is, perhaps, unnecessary to say that the same presumptions by virtue of which a lien is placed upon a vessel for the payment of necessary supplies furnished to her in a foreign port upon the sole order of the master are not applicable to the case of supplies furnished in a foreign port to a vessel upon the express direction of the known general owner. In the latter case, there is not, prima facie, a presumption that there was a necessity for the credit of the ship. The known general owner may, however, expressly pledge the credit of his vessel in a foreign port for supplies, and there often are circumstances and facts which show that the credit of the vessel was pledged in fact, though not in words, and that such security was within the common intent of both parties."

In The Valencia v. Ziegler, 165 U. S. 264, 270, 17 Sup. Ct. 323, 325, 41 L. Ed. 710, 713, it is stated in the opinion as follows:

"It is true that libelants delivered the coal in the belief that the vessel, whether a foreign or a domestic one, or by whomsoever owned, would be responsible for the value of such coal. But such a belief is not sufficient in itself to give a maritime lien. If that belief was founded upon the supposition that the steamship company owned the vessel, no lien would exist, because, in the absence of an agreement, express or implied, for a lien, a contract for supplies, made directly with the owner in person, is to be taken as made 'on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.' The St. Jago de Cuba, 9 Wheat. 409, 416, 417, 9 L. Ed. 122, 124. And if the belief that the vessel would be responsible for the supplies was founded on the supposition that it was run under a charter party, then the libelants are to be taken as having furnished the coal at the request of the owner pro hac vice (Stephenson v. The Francis, 21 Fed. 715, 717; The Samuel Marshall, 4 C. C. A. 385, 54 Fed. 397, 399), without any express agreement for a lien, and in the absence of any circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred. In the present case we are informed by the record that there was no express agreement for a lien, and that nothing occurred to warrant the inference that either the master or the charterer agreed to pledge the credit of the vessel for the coal."

In The Rapid Transit, 11 Fed. 322, 329, the learned judge states:

"The real question is whether the supplies have been furnished in a 'foreign port' (that is, in a place where there is no owner to supply her on his own credit), on the credit of the vessel. Even there, if the owner be present, and have sufficient credit, no lien arises. His mere presence would not, perhaps,

avoid the lien; but if he buy the supplies, and be of credit, and have the opportunity to give his own security by making contract liens or otherwise, there is no implied lien. The maritime lien would arise or not, according to circumstances."

This court is constrained by the above authorities, and considers that they embody the proper principles. Liens are implied upon the theory that the ship's necessities could only be relieved by pledging her, and that the owner, who has and controls the capital which supports her operation, is not present to furnish his personal credit, and that, in his absence, the person in charge of the vessel is entitled to pledge the ship, and does impliedly pledge the ship, for whatever is necessary to aid the undertaking; and, in the absence of notice or knowledge of the lack of such necessity, the person furnishing supplies, acting in good faith, is justified in parting with his property upon the order of the person in charge of the vessel. But if the owner be present, with full power to make his own terms, with full power to make a special pledge of the ship, with full power to pledge his other property, with full power to make any and all arrangements to which the opposite party may consent, the reason for a lien by implication fails. In the case at bar all that the apparent owner had to offer in the way of financial inducement, save the franchise of the corporation, was within the jurisdiction of the alleged lienor's residence. The order for the repairs was made under no coercion of circumstances, either in the selection of the person who was to do the work or otherwise; and the person undertaking the repairs obviously was not aware that the Manhattan Company was other than a resident of the state of New York at the time of the making of the contract, and certainly not upon the trial, for he testified that he "knew that the Manhattan Steamship Company was a corporation of New York"; at least he gives no evidence that he was aware that it was a foreign corporation at the time the engagement was made. If a person undertaking repairs did not know at the time the contract was made that the owner of the vessel was a nonresident, he could not have either known or believed at such time that he was entitled to a lien for such repairs. If one of the navigation companies—for instance, the Cunard Company—having a principal place of business in the city of New York should order repairs upon one of its vessels at the port of New York, and there was nothing more than that, upon what theory could it be contended that the repairer was entitled to a maritime lien? It is upon the ground that the burden of showing a lien is upon the libelant, and that it has not discharged its duty in this regard, although it has otherwise brought itself within the rule permitting a lien, that a decree dismissing the libel must be entered.